**UNITED STATES OF AMERICA**

v.

**Emmanuel ABIODUN, Atairu Akuetiemehe, and OJO Akinseye Akinyemi, Defendants.**

**No. S7 04 CR. 1316(DC).**

United States District Court, S.D. New York.

July 20, 2006.

Michael J. Garcia, U.S. Attorney for the Southern District of New York, by Marcus A. Asner, Jessica A. Mordas, Assistant U.S. Attorneys, New York City, for U.S.

Andrew H. Freifeld, New York, New York, for Defendant Abiodun.

Goldberg & Kaplan, LLP, By Brian I. Kaplan, New York, New York, for Defendant Akuetiemehe.

Michael S. Pollok, New York, New York, for Defendant Akinyemi.

## OPINION

CHIN, District Judge.

In this case, defendants are charged with participating in a massive identity theft ring that was responsible for the theft of credit information for tens of thousands of individuals and the loss of tens of millions of dollars. Defendants have pled guilty to conspiracy to commit credit card and access device fraud, but the parties disagree as to the amount of loss to be attributed to each defendant for purposes of sentencing. Defendant Emanuel Abiodun also challenges the Government's contention that he was an organizer or leader in the conspiracy.

To resolve the factual disputes, I conducted an evidentiary hearing, pursuant to *United States v. Fatico*, 579 F.2d 707 (2d Cir.1978). Three cooperating witnesses, who pled guilty to being a part of the conspiracy, testified, as did two law enforcement witnesses. Together, their testimony provides a vivid picture of the inner workings of a substantial identity theft ring and demonstrates how easily credit information can be stolen and put to ill use.

My findings of fact and conclusions of law follow.

## STATEMENT OF THE CASE

### A. The Facts

Defendants were part of a loosely connected group of some thirty individuals who, over the course of five or six years, engaged in a scheme to commit credit card and access device fraud through the use of stolen credit information. They obtained credit reports for randomly selected individuals—the names were usually taken from publicly available telephone directories—and used the information to obtain credit cards and other access to lines of credit. They then used the credit cards to purchase merchandise, often for re-sale to a fence, and they drew down on the lines of credit to steal the available funds. The Government contends that the group accounted for $50 to $100 million or more in losses.

### 1. Background

Linus Baptiste, a British citizen trained as a plumber, came to the United States in 1987. (Tr. 12–13).[1] In 1991 Baptiste met Yvonne Cummings ("Yvonne") and eventually they were married. (Tr. 15, 34). She introduced him to her brother, Philip Cummings ("Cummings") and Baptiste and Cummings became friends. (Tr. 15, 35–37). They kept in touch even after Baptiste and Yvonne were divorced in 1996. (Tr. 36–37).

Baptiste eventually became friends with an individual named Benny. Baptiste and Benny would "hang out" at Frank Obi's African Market ("Obi's") in the Bronx. (Tr. 25–27). Obi's was a store that sold African groceries and the basement contained a "social area" where people could eat, drink, and listen to music. (Tr. 27–28, 217). Baptiste became a regular at Obi's, going three or four times a week. He became friendly with other regulars—most of whom were from Nigeria originally. (Tr. 28–29, 109, 216–17). He was often referred to by his nickname, "English." (Tr. 13, 205, 212, 345).

---

**1.** References to "Tr." are to the transcript of the *Fatico* hearing conducted on April 18 and 19, 2006.

In 1997 or 1998, Benny approached Baptiste about participating in a credit card scheme. Benny had a source for fraudulent credit cards and asked Baptiste to sell them for him. (Tr. 29–30). The credit cards had varying credit limits, and Baptiste agreed to and did sell them, for $300 each, to others, including some of the regulars at Obi's. Baptiste received $100 for each card he sold. (Tr. 30–32).

## 2. *The Scheme Is Hatched*

In early 2000, Baptiste learned that Cummings had obtained a job working for Teledata Communications, Inc. ("TCI"), a software company. Financial institutions and retail companies used TCI software to access consumer credit information from consumer credit reporting agencies such as Equifax, Experian Information Solutions ("Experian"), and TransUnion. (Tr. 39–41, 267, 311–12; GX 3502–1 ¶ 2(a)).[2]

Baptiste informed Benny that he knew someone who could get credit reports, and Benny asked him to get one. (Tr. 40). Baptiste approached Cummings and asked him to get a credit report. Cummings did so, and provided a single credit report to Baptiste, who in turn gave it to Benny. (Tr. 40–41). Benny was not satisfied with the credit report, a TransUnion report, because it did not provide full credit card and social security numbers. Benny asked Baptiste to ask Cummings to get an Experian credit report because Experian reports provided more detail. Cummings did so, and Benny was pleased with the Experian report. (Tr. 41). A deal was

struck, as Benny agreed to buy additional credit reports from Baptiste at $60 per credit report. Baptiste agreed to split the proceeds with Cummings, with each to receive $30 per report. (Tr. 42).

A couple of days later, Benny "placed an order" for credit reports by providing Baptiste with a list of names and addresses for more than 20 individuals for whom he wanted credit reports. (Tr. 42–43). Baptiste arranged to meet Cummings, who brought a laptop and small printer to the meeting. (Tr. 43). Cummings connected the computer to a telephone line and used the TCI software and a subscriber code and password to access credit information at one of the credit reporting agencies. Cummings typed in the names from Benny's list and began printing out credit reports. (Tr. 43–44; GX 3502–1 ¶ 2(a)). Baptiste then returned the original list with the credit reports to Benny. (Tr. 44).

## 3. *The Scheme Expands*

Thereafter, Benny started requesting more and more credit reports by providing lists of names, sometimes two or three times a week, with as many as 50 names on a list. Some of the lists appeared in different handwriting and apparently were supplied by other individuals. (Tr. 44–45). For each credit report, Benny paid $60, which Baptiste and Cummings split. (Tr. 45–46).

Eventually, Baptiste started selling credit reports to others. Benny told people at Obi's and elsewhere that Baptiste was selling reports. When others ap-

**2.** Consumer credit reporting agencies furnish credit reports to subscribing lenders and merchants who receive applications from consumers for credit. The agencies obtain account information from reporting creditors, who provide regular reports as to the status of their customers' accounts. The reports include information such as the amount of credit available on a particular account, the amount owed as of a particular date, and whether the account is current. *See, e.g.,* Barbara C. Sherland, *The Functions of Consumer Reporting Agencies Under the Fair Credit Reporting Act,* 59 Wash. L.Rev. 401, 402–03 (1984). The credit agencies maintain the databases of consumer credit information. (Tr. 312).

proached Baptiste and asked if they could also buy reports, he agreed to sell to them as well. (Tr. 46, 112–13, 213, 233–34, 251–52; *see, e.g.,* GX LB1, LB2 (hand-written lists of names and addresses)). In late 2000, Baptiste began selling reports to Abiodun. (Tr. 46–47; *see* Tr. 16–17, 60). He also sold reports to Akuetiemehe (Tr. 17–18, 59, 60) and Akinyemi (Tr. 18, 60).[3]

Cummings continued to go to Baptiste's office, where the two would download and print-out credit reports. (Tr. 47). Initially Cummings obtained many of the reports by using the subscriber information for the Grand Rapids, Michigan, branch of the Ford Motor Credit Company ("Ford") to access the database at Experian. In other words, Baptiste and Cummings used the TCI software to log on to Experian, using the access information for (and thus pretending to be) the Grand Rapids branch of Ford. Credit reports for some 15,000 individuals were downloaded in this manner, all without authorization from the Grand Rapids branch of Ford. (GX 3502–1 ¶ 3; Tr. 56, 263–66, 311).[4]

In 2001, Cummings moved to Atlanta, Georgia. He and Baptiste continued to sell credit reports, processing the requests—lists of names and addresses—by telephone, fax machine, and express mail. (Tr. 47–48, 50–51). Cummings would return frequently to New York and he and Baptiste would process requests for credit reports on those occasions as well. (Tr. 48). Because of the volume of "work,"

however, the long-distance processing of the requests became onerous, and Cummings and Baptiste agreed that Baptiste would process the requests, with someone else's help, in New York. (Tr. 49).

Baptiste recruited Terry Smith to help him in New York, and Cummings gave them a computer and printer. The computer had the TCI software and the customer codes installed on it. Baptiste and Smith began processing the requests, sometimes meeting four or five times a week to download and print out credit reports. Eventually, because of the volume of usage, Baptiste went through four different printers. (Tr. 49–50, 53). Smith typed in the names and addresses from the lists, and he received $15 per credit report, which came out of Cummings's "cut." (Tr. 53–54, 57). Baptiste would return the lists and printed credit reports to the individuals who had requested and paid for them. (Tr. 57–60, 214–15). In 2002, Baptiste began downloading credit reports at his home in New Rochelle. (Tr. 99).

### 4. *The Use of the Credit Reports*

The individuals who submitted lists of names got the names from different sources, but primarily from telephone directories. They targeted wealthier neighborhoods, often from out-of-state. (Tr. 54–55, 75–76, 214, 243–44). In other words, the individuals would find names and addresses of people who lived in wealthier neighborhoods who presumably had larger

---

**3.** Baptiste knew Abiodun as "Tony," Akuetiemehe as "AT," and Akinyemi as "Yemi" or "Dealer." (Tr. 16–18).

**4.** In fact, Ford uncovered the unauthorized downloading when it started receiving bills for credit reports it had not ordered and after consumers began complaining about the issuance of credit reports purportedly for transactions with the Grand Rapids branch of Ford when they had made no applications to the branch for credit. (GX 3502–1 ¶ 3(c); Tr.

264–65). When the access information for a particular customer stopped working, Cummings would provide a new code. This happened approximately five times. (Tr. 55–57; *see also* Tr. 100–01). Other customers whose codes were used included Washington Mutual Bank in Florida, Washington Mutual Finance Company in Tennessee, Dollar Bank in Ohio, and other companies in Illinois, Indiana, Texas, and Minnesota. (GX 3502–1 ¶¶ 4(b), 5(d); Tr. 265–66).

amounts of credit. The credit reports for these individuals would contain account numbers for credit cards and lines of credit as well as other identifying information, such as social security numbers and dates of birth. (Tr. 41; *see, e.g.,* GX AA1).

The members of the group would then review the credit reports to look for credit cards or lines of credit where there was a substantial amount of credit available. (Tr. 221–23). A "good credit card to attack" was one with a low balance and high available credit. (Tr. 223–24). Typically, four out of ten credit reports would be "useful," and a "useful" credit report would yield approximately two usable credit cards or credit lines. (Tr. 231, 238, 247). A typical usable credit card would have an average of $5,000 in available credit. (Tr. 232). Credit reports that were not "useful" would be "tuck[ed] . . . away," with the hope that they would become useful in the future if, for example, a line of credit was increased or a credit card balance was paid down. (Tr. 239; *see* Tr. 272).[5]

The purchasers of the credit reports would then use the information to obtain credit cards and checks for the lines of credit. Armed with account numbers and identifying information, they would call the banks and credit card companies to "report" a change of address. After waiting a few days, they would report a lost or damaged credit card and request replacement cards or new checks, asking that they be mailed to a false address (*i.e.,* a friend's address or even a vacant home). Sometimes they would obtain false documents, such as drivers licenses, in the names of the individuals for whom they had credit reports, listing the false addresses. They would then use these false identification documents to obtain credit cards or cash checks or draw down on lines of credit, including home equity lines. Sometimes members of the group would actually go to a bank to transact business or to open up accounts, using the false identification documents. Fraudulently obtained checks would be cleared through these bank accounts. Other members of the group would use the credit cards to purchase merchandise for personal use or re-sale to a fence or to send to Nigeria or for entertainment and socializing. (Tr. 62–77, 218, 226–30, 236, 240).

The members of the ring considered some banks to be "not good" for these purposes—these banks had implemented better security measures and included Citibank, Chase, and Bank of New York. (Tr. 66–67, 225–26). Some banks, including small banks and out-of-state banks, were considered "good"—they were more easily taken advantage of. (Tr. 66). Providian and Capital One were considered "easy to hit." (Tr. 226). Once a member of the group obtained a replacement card, he would "test" it by trying to buy gas at a gasoline station. If the card worked, the person would then attempt to "bust [it] out" by going to a store to buy merchandise. The members of the group believed that some stores, such as Home Depot and Best Buy, were easy targets because they had less stringent security measures, *e.g.,* they did not ask for identification for large purchases. (Tr. 229–30).

### 5. *Defendants*

#### a) *Abiodun*

Baptiste met Abiodun at Obi's. (Tr. 81). Abiodun started buying credit reports

---

5. A couple in Columbus, Ohio, wrote a letter to the Government dated April 10, 2006, complaining that someone had recently tried to write a check on one of their accounts that had been closed for some time because of fraud. (Tr. 271–72; GX JA6). They were following up on letters they had been sent by the U.S. Attorney's Office beginning in early 2003. (Tr. 318).

from Baptiste in late 2000 and continued until 2002. He started "small," but in time increased his purchases to as many as 60 or 70 or, on one occasion, 90 names at a time. He purchased approximately 400 to 500 credit reports total. (Tr. 86–87). Abiodun thus became one of Baptiste's biggest customers for credit reports. (Tr. 84). Abiodun was successful at committing this fraud; he wore Armani and Versace suits, Movado watches, and Cartier glasses, and drove a Lexus. (Tr. 85).

On May 5, 2004, another member of the group, Adekunle Olusola, was arrested in a bank in Lancaster, Pennsylvania, trying to get a cash advance on a credit card in the name of one of the victims of the fraud in this case, using a false driver's license. (Tr. 360–61, 421–22). Abiodun provided Olusola with the credit card and drove him to Lancaster from New York. (Tr. 361–62). Olusola went into the bank while Abiodun waited in the parking lot. (Tr. 363). Abiodun also gave Olusola approximately ten credit reports, but Olusola never used them because Abiodun did not follow-up on his promise to help Olusola call the banks. (Tr. 364, 386–87, 391–92). Olusola received the reports from Abiodun at the latter's storage facility, where Abiodun had stored, among other things, a large screen plasma television, a Bang & Olufsen speaker, two boxes containing approximately a thousand sheets of blank check stock, handwritten lists of names and addresses, and documents for companies and individuals with no legitimate connection to him. (Tr. 365–66, 407–15; see GX EA9–EA18).

In March 2003, another member of the group, Julius Owolabi, was arrested in Massachusetts. He had obtained $3,800 in cash as an advance on a credit card in another person's name (someone from the TCI database), and was arrested when he was trying to get another cash advance at a second bank. (Tr. 371–72, 423–25). At his guilty plea, Owolabi acknowledged that he worked with his friend Abiodun, in trying to get these cash advances. (Tr. 433–34; GX 101 at 16–20). Owolabi stated that he knew Abiodun was obtaining credit reports. Although he denied that he worked with Abiodun with the reports, he admitted working with Abiodun to get 15 or more fraudulent credit cards, which were then used to get cash advances, which in turn were used to buy merchandise. (GX 101 at 18–20). In fact, as Baptiste testified, Owolabi and Abiodun were "close" and worked together within the identity theft ring. (Tr. 77).

The names of the victim in the Pennsylvania incident involving Olusola and the victim in the Massachusetts incident involving Owolabi appear in the TCI database, and clearly it was Abiodun who obtained the credit reports for these individuals from Baptiste. (Tr. 360–62, 370–72, 407, 421–26, 433; GX Experian–FMC no. 91220).

### b) *Akuetiemehe*

Baptiste also met Akuetiemehe at Obi's. They became friends and socialized together. Akuetiemehe began buying credit reports from Baptiste in 2002. He bought as few as 20 reports and as many as 100 reports at a time from Baptiste, for a total of some 300 to 400 reports. At some point Akuetiemehe was selling credit reports himself; in other words, he was obtaining credit reports from a source other than Baptiste and selling them to others. (Tr. 88–92; GX AA1).

Akuetiemehe was arrested on December 22, 2004, in the Bronx, after he had fled from his apartment as agents were attempting to execute an arrest warrant. Akuetiemehe was found in a laundromat around the corner wearing nothing but a blue suit jacket and boxer shorts. He had asked the manager of the laundromat to

hide a bag that he was carrying. The bag contained more than 200 credit reports as well as other financial and bank documents, including documents bearing the name and photograph of a fraud victim who had never lived in the Bronx; the documents listed as an address the building in which Akuetiemehe lived at the time. (Tr. 395–401; *see* GX AA1–AA3, AA5).

### c) *Akinyemi*

Baptiste also knew Akinyemi through Obi's. He was one of Baptiste's smaller customers, purchasing only approximately 50 credit reports. (Tr. 92–95).

### 6. *The Extent of the Loss*

The record contains a number of factors that bear on the issue of the amount of the loss caused by the conduct of defendants and their co-conspirators. I set them out now and I discuss my final conclusions as to the amounts of loss below.

### a) *Baptiste's Testimony*

Baptiste estimated that he and his colleagues illegally downloaded more than 20,000 credit reports. (Tr. 20, 101).

### b) *The Database*

The Government is in possession of a database, compiled by law enforcement authorities from information received from TCI customers (including Ford) as well as the three credit agencies. (Tr. 263–64, 266). The database contains information for many of the victims whose credit reports were stolen in this case. (Tr. 263, 266). The database contains entries for some 29,000 credit reports, but some of these are duplicative as some credit reports were requested twice. (Tr. 267). The

authorities were able to determine that these credit reports were requested by Baptiste and Cummings principally because the same telephone numbers—numbers associated with them—were used to request the reports. (Tr. 265–66; GX 3502–1 ¶¶ 8–10).

### c) *The Government's Letters to Victims*

In late 2002 and early 2003, the U.S. Attorney's Office for the Southern District of New York sent out some 26,000 letters to victims in the database requesting information to help calculate the extent of the losses from the credit card fraud and identity theft. Some 9,000 letters were returned as undeliverable, in part because some people had moved with the passage of time and some of the addresses were fraudulent addresses employed by members of the group. The Government received 1,209 responses. (Tr. 268–69).

The Government compiled the information into a spreadsheet, which was received into evidence at the hearing as GX JA1. (Tr. 270). Following the hearing, at the Court's request, the Government rechecked the information and submitted a slightly revised spreadsheet, GX JA1–REV. The revised spreadsheet shows a total loss for the 1,209 responses of $13,328,471.47, or an average loss per victim for the 1,209 victims of $11,024.38. (GX JA1–REV; Gov't 5/4/06 Letter at 1). Some of the losses are substantial, including, for example, a loss of $290,000 (no. 1170) on a secured credit line and a loss of $146,255.00 (no. 1187) on a home equity line. (GX JA1–REV).[6]

### d) *The Government's Subpoenas*

The Government also subpoenaed a number of banks and credit card compa-

---

**6.** The Government confirmed that one couple in California had a home credit line of

$300,000, which was fraudulently drawn down on to the extent of $297,000. (Tr. 433).

nies, providing a copy of the victims database and requesting information relating to these victims. (Tr. 273). Of course, the Government could only subpoena selected banks and credit card companies, and there were some difficulties in getting proper responses from some of the subpoenaed banks and companies. (Tr. 273–74). Some information was received, however, and the Government prepared another spreadsheet, GX JA2, which also was revised after the hearing and resubmitted as GX JA2–REV.

With the information attributable to the 1,209 victims who responded to the letter eliminated to avoid double-counting, the spreadsheet shows an additional $15,299,673.74 in losses for the subpoenaed companies that provided usable information. (GX JA2–REV; Tr. 275–77). This number does not include losses sustained by banks that were not subpoenaed or losses sustained by Best Buy and Home Depot, even though these companies were targets, because of difficulties in securing compliance with the subpoenas. Some companies, such as Dell and Gateway, simply were not contacted. (Tr. 278; see Tr. 273–74). Adding this amount to the total of $13,328,471.47 for the 1,209 responding victims results in a total of $25,313,654.21 in losses, based on the information received. (GX JA2–REV; see Tr. 276).

### e) Antonino's Analyses

Inspector James Antonino of the United States Postal Service took ten credit reports each for co-defendant Eniete Ukpong and defendant Akuetiemehe, randomly selected from reports seized from them, and analyzed them, putting the informa-

tion into spreadsheets. (GX JA4, JA5; Tr. 280–83). Antonino reviewed each credit report and listed the credit cards and credit limit for each. (Tr. 280–81). The ten reports for Akuetiemehe showed an average credit limit per report of $40,016 and the ten reports for Ukpong showed an average credit limit per report of $64,744. (GX JA4, JA5). Taking both sets together, the average credit report had a credit limit of $52,380. (Tr. 283). This amount is the credit limit, not the amount of available credit. (Tr. 281).

### f) Ezediaro's Testimony

Emanuel Ezediaro, a cooperating witness, estimated that four out of ten credit reports were "useful" and that each "useful" credit report would produce approximately two credit cards that could be used to obtain merchandise. On average, each usable credit card had approximately $5,000 of credit available. (Tr. 231–32, 238).[7] Accordingly, based on this rough estimate, every ten credit reports would yield approximately eight credit cards that would provide a total of some $40,000 in credit. (Tr. 284–85). Put another way, the credit reports yielded an average of approximately $4,000 per credit report, taking into account all credit reports. (Tr. 285).

### g) Co–Conspirators' Stipulations

The various co-conspirators stipulated to the loss amount for sentencing purposes. These stipulations, of course, are not binding on the three defendants before the Court, but they are worth considering.

Erring on the side of caution in favor of defendants, I do not include these additional "two or three" reports in my loss calculations.

---

7. In fact, Ezediaro testified that "two or three" of the reports that were not immediately useful could later turn out to be useful, increasing the number of "useful" reports to six or seven out of every ten. (Tr. 249).

| | |
|---|---|
| Philip Cummings | $50 million–$100 million |
| Eniete Ukpong | $200,000—$400,000 |
| Julius Owolabi | $200,000—$400,000 |
| Atanda Ogunniyi | $120,000—$200,000 |
| Robinson Ejike | $120,000—$200,000 |
| Alexander Alli | $70,000—$120,000 |
| Lukman Lawal | $30,000—$70,000 |
| Ojo Akinseye Akinyemi | $5,000—$70,000 |

(Gov't 5/3/06 Letter at 1).

### 7. The Non–Financial Losses

Of course, the losses caused by identity theft are not purely financial. Many of the victims suffered no financial loss, as their banks and financials institutions absorbed the fraudulent charges and withdrawals. But victims from all over the country suffered in other respects, as their responses to the Government's mailing show. I quote from some of them now:

- From a resident of Staten Island, New York: "I personally did not suffer a personal [financial] loss with this fraud[.] The only thing my family and I suffered was stress in not knowing if I would."

- From an Ohio resident: "Key Bank absorbed the entire financial loss of $47,400 that was taken from my line of credit. Our only loss was time, worry, and sleep. We terminated our line of credit."

- From a resident of Taos, New Mexico: "I have had no unauthorized debits from my bank account [for over a year]. I did for five years have both from the bank account and credit cards. I was a nervous wreck when my statements came about opening them.... The whole thing was a nightmare for me as a recent widow on a limited income."

- From a resident of Scottsdale, Arizona: "This case of stolen ID ... has changed my life and I missed out on a better life for me & my two sons."

- From a resident of Whitesboro, New York: "I am a victim of [Cummings's] theft [of consumer information]. It

has cost me countless hours of my time trying to rectify his theft of my identification. As recently as October of 2004, I was still trying to clear my credit standing with Fleet Bank. I have received threatening phone calls and letters from three different collection agencies trying to collect a debt I did not incur."

- From an Illinois resident writing in December 2004: "I noted an unexpected $100 charge to Bank One Internet on my Elan MasterCard bill in February 2002, and called to report this error.... In mid-March Elan MasterCard sent me a copy of Bank One's explanation of the charge that revealed a new bank account had been set up with them using my name, SSN and DOB, and with [a false] address [in the] Bronx ... and a [false] N.Y. driver's license in my name. What a shock! Someone knew all my vital information and might be taking steps to steal from my accounts. Then began countless hours of telephoning, wondering where this person was going to strike and checking every source of information I could imagine. This caused much worry both for myself and for my wife. We had recently retired and she had been diagnosed with terminal cancer so I spent most of my time caring for her. (My wife died on June 28, 2002.) We had always tried to meet all our financial obligations on time...."

(Gov't Victim Impact Statements 2, 3, 6, 8, 9, 10 (numbered by the Court)).

### B. Prior Proceedings

Cummings and others were indicted in 2003, in case no. 03 Cr. 109(GBD). Cummings pled guilty in September 2004 and was sentenced by Judge Daniels in January 2005 to 14 years imprisonment. Bap-

tiste was charged in a complaint filed on October 29, 2002, in case no. 03 Cr. 111(KMW). He pled guilty in January 2003 and is awaiting sentence.

The instant case was commenced by an indictment filed on December 13, 2004, against Abiodun, as a single defendant, under the name Eleduma Sunday Awolabi. Eventually, superseding indictments were filed against Abiodun under his true name, and Akuetiemehe and Akinyemi as well as others were added as defendants.

Abiodun pled guilty before Magistrate Judge Maas on January 13, 2006, to conspiracy, identity fraud, and possession of illegal access devices. He pled without a plea agreement. The Government's *Pimentel* letter contended that the amount of loss was greater than $50 million and less than $100 million. (Gov't 1/11/06 Letter at 2).

Akuetiemehe pled guilty before Magistrate Judge Gorenstein on January 4, 2006, to conspiracy, identity fraud, and possession of illegal access devices. Akuetiemehe pled without a plea agreement. Likewise, the Government's *Pimentel* letter contended that the amount of loss was greater than $50 million and less than $100 million. (Gov't 1/3/06 Letter at 2).

Akinyemi pled guilty before Magistrate Judge Maas on January 12, 2006, to conspiracy, identity fraud, and possession of illegal access devices. He pled pursuant to a plea agreement that left open the amount of loss: the Government took the position that the loss attributable to him was greater than $30,000 but less than $70,000 and Akinyemi contended that the amount was greater than $5,000 but less

than $10,000. (Gov't 1/11/06 Letter at 2, 4).

To resolve the factual differences, the Court conducted a *Fatico* hearing on April 18 and 19, 2006. The parties thereafter submitted additional papers and exhibits.

### DISCUSSION

I discuss first the issue of the amount of loss and second the issue of Abiodun's role in the conspiracy.

### A. The Amount of Loss

#### 1. Applicable Law

The Guideline applicable to the conduct in question is U.S. Sentencing Guidelines § 2B1.1, which covers offenses involving fraud and deceit.[8] Pursuant to § 2B1.1(a)(2), the base offense level is 6. The area of disagreement lies in the adjustment, if any, for the amount of loss, as set forth in § 2B1.1(b)(1), which provides in part:

If the loss exceeded $5,000, increase the offense level as follows:

| Loss (Apply the Greatest) | | Increase in Level |
|---|---|---|
| (A) | $5,000 or less | no increase |
| (B) | More than $5,000 | add 2 |
| (C) | More than $10,000 | add 4 |
| (D) | More than $30,000 | add 6 |
| (E) | More than $70,000 | add 8 |
| (F) | More than $120,000 | add 10 |
| (G) | More than $200,000 | add 12 |
| (H) | More than $400,000 | add 14 |
| (I) | More than $1,000,000 | add 16 |
| (J) | More than $2,500,000 | add 18 |
| (K) | More than $7,000,000 | add 20 |
| (L) | More than $20,000,000 | add 22 |
| (M) | More than $50,000,000 | add 24 |
| (N) | More than $100,000,000 | add 26 |

U.S. Sentencing Guidelines Manual § 2B1.1(b)(1) (2005). Hence, there is a sliding scale with offense levels added according to the amount of the loss.

---

**8.** In his plea agreement, Akinyemi agreed with the Government that the November 1, 2001, edition governed. In the *Pimental* letters issued to both Abiodun and Akuetiemehe, the Government asserted that the November

1, 2004, edition applied. As I do not believe there are any material differences between the two editions and the current edition in these respects, I apply the current one, effective November 1, 2005.

The Commentary to subsection (b)(1) explains that "loss is the greater of actual loss or intended loss." *Id.* § 2B1.1 appl. n. 3(A). "Actual loss" means "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* § 2B1.1 appl. n. 3(A)(i). "Intended loss" means "the pecuniary harm that was intended to result from the offense" and "includes intended pecuniary harm that would have been impossible or unlikely to occur." *Id.* § 2B1.1 appl. n. 3(A)(ii).

■ In determining the amount of loss, the Court is to consider all "relevant conduct." *Id.* § 1B1.3(a). Relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or wilfully caused by the defendant," or, in the case of "jointly undertaken criminal activity," *i.e.*, a plan or scheme or endeavor undertaken by the defendant "in concert with others," "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." *Id.* § 1B1.3(a)(1). In other words, where a defendant undertakes a criminal plan or enterprise "in concert with others," he is accountable for the conduct of others that was (i) "in furtherance of the jointly undertaken criminal activity" and (ii) "reasonably foreseeable." *Id.* § 1B1.3 appl. n. 2. *See generally United States v. Chalarca*, 95 F.3d 239, 243 (2d Cir.1996).

■ In determining the amount of the loss, "[t]he court need only make a reasonable estimate of the loss." U.S. Sentencing Guidelines Manual § 2B1.1 appl. n. 3(C) (2005). Indeed, the Second Circuit has recognized that where a defendant's offense level is tied to the amount of loss caused by his offense, "the Guidelines do not require that the sentencing court calculate the amount of loss with certainty or precision." *United States v. Bryant*, 128 F.3d 74, 75 (2d Cir.1997); *accord United*

*States v. Singh*, 390 F.3d 168, 192 (2d Cir.2004) ("A reasonable estimate of the loss is all that is necessary."). Application note 3(C) specifically states:

> The estimate of the loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as the following:
>
> .     .     .     .     .
>
> (iii) The approximate number of victims multiplied by the average loss to each victim.
>
> (iv) The reduction that resulted from the offense in the value of equity securities or other corporate assets.
>
> (v) More general factors, such as the scope and duration of the offense and revenues generated by similar operations.

U.S. Sentencing Guidelines Manual § 2B1.1 appl. n. 3(C) (2005). Accordingly, the Court may estimate the amount of loss "by extrapolating the average amount of loss [for each victim] from known data and applying that average to transactions where the exact amount of loss is unknown." *Bryant*, 128 F.3d at 76 (specifically referencing § 2B1.1 and commentary thereto).

Finally, the Guidelines contain a special rule directed toward stolen credit card and access device fraud, which provides that "[i]n a case involving any counterfeit access device or unauthorized access device, loss includes any unauthorized charges made with the counterfeit access device ... and shall be not less than $500 per access device." U.S. Sentencing Guidelines Manual § 2B1.1 appl. n. 3(F)(i) (2005).

■ The burden is on the Government to prove the loss amount by a preponderance of the evidence. *See United States v.*

*Ruggiero,* 100 F.3d 284, 290 (2d Cir.1996) (addressing generally the need to establish relevant facts at sentencing).

### 2. *Application*

■ The Government's contention that this identity theft ring was responsible for $50 million to $100 million in losses is reasonable. The 1,209 responses to the Government's mailing showed total losses of $13,328,471.47. This number, of course, is understated, as the vast majority of victims did not respond, presumably because the banks or financial institutions absorbed the losses and many of these individuals did not want to become entangled in the criminal justice system. The banks and other financial institutions that provided meaningful responses to the Government's subpoenas reported another $15,299,673.74 in losses, after eliminating any duplication with the 1,209 respondents. This number likewise is grossly understated, as it includes information from only seven financial institutions or merchants. Many more were victimized. Hence, the total of $25,313,654.21, based on the limited information received, significantly under-represents the total loss caused by this group. In view of the number of credit reports illegally downloaded by Cummings and Baptiste—substantially in excess of 20,000 and probably closer to 30,000—more likely than not the total loss exceeds $50 million.

The Government does not argue that Abiodun, Akuetiemehe, and Akinyemi are responsible for the entire loss amount. Rather, the Government argues that each defendant should be sentenced based on the losses attributable to the credit reports each one illegally purchased from Baptiste. Surely each defendant should be responsible, at a minimum, for the harm caused by the illegal use of the credit reports that they personally purchased.

The Government, however, is not able to prove that specific credit reports resulted in specific fraudulent purchases that can be tied to a particular defendant. With a few exceptions, we do not know which credit reports were specifically purchased by Abiodun or Akuetiemehe or Akinyemi and we do not know the precise losses attributable to the credit reports purchased by each. Rather, the Government proposes calculating the average loss sustained per credit report and then multiplying the average times the number of reports purchased by each defendant.

The approach is reasonable and is precisely the kind of approach contemplated for a situation such as this where there are many—indeed, tens of thousands—victims and the precise amounts are difficult to ascertain. *See* U.S. Sentencing Guidelines Manual § 2B1.1 appl. n. 3(C)(iii) (2005) ("The estimate of the loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as . . . [t]he approximate number of victims multiplied by the average loss to each victim."). The Guidelines do not require "certainty or precision." *Bryant,* 128 F.3d at 75.

Defendants argue that the Government's approach relies on speculation. This objection is overruled. The Government's approach is based not on speculation, but on reasonable extrapolation based on reliable information. *See id.* at 76. The database compiled by law enforcement authorities from data provided by the credit agencies and TCI customers corroborates Baptiste's testimony that he and his colleagues illegally downloaded more than 20,000 credit reports. Indeed, the number is closer to 30,000. Inspector Antonino's analysis of twenty randomly selected credit reports shows an average credit limit of some $52,380 per report, and the 1,209 responses to the Govern-

ment's showed an average loss per victim of $11,024.38. These numbers corroborate Ezediaro's testimony that every ten credit reports (assuming only four were "useful") yielded roughly $40,000 in credit that the ring members could tap.

█ Defendants also argue that the Government's approach relies on hearsay and other inadmissible evidence. But the Federal Rules of Evidence do not strictly apply at *Fatico* hearings, *see* Fed.R.Evid. 1101(d)(3); *United States v. Fell*, 360 F.3d 135, 144 (2d Cir.2004), and the Guidelines expressly provide that "[i]n resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information *without regard to its admissibility under the rules of evidence applicable at trial*, provided that [it] has sufficient indicia of reliability...." U.S. Sentencing Guidelines Manual § 6A1.3(a) (2005) (emphasis added). The Second Circuit has also recognized that "[t]he procedures used at sentencing are within the discretion of the district court so long as the defendant is given an adequate opportunity to present his position as to matters in dispute." *United States v. Maurer*, 226 F.3d 150, 151 (2d Cir.2000). Here, the evidence relied on by the Government is reliable, and defendants had a fair opportunity to be heard.

Accordingly, I find as follows:

● The loss attributable to Abiodun is between $1.6 million and $2.0 million, based on his purchase of 400 to 500 reports, multiplied by the average loss per report of $4,000. His offense level will be increased 16 levels in accordance with Guidelines § 2B1.1(b)(1)(I).

● The loss attributable to Akuetiemehe is between $1.2 million and $1.6 million, based on his purchase of 300 to 400 reports. His offense level will also be increased 16 levels in accordance with Guidelines § 2B1.1(b)(1)(I).

● The loss attributable to Akinyemi is $200,000, based on his purchase of 50 reports. As he and the Government entered into a plea agreement in which the Government contended that the loss attributable to Akinyemi was greater than $30,000 but less than $70,000, I will assume a loss amount of more than $30,000 and less than $70,000. Akinyemi's offense level will be increased 6 levels in accordance with Guidelines § 2B1.1(b)(1)(D).

**B.  *Role***

The Guidelines provide for an upward adjustment in the offense level for an "aggravating role"—a leadership or supervisory role. U.S. Sentencing Guidelines Manual § 3B1.1 (2005). If a defendant was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive," his offense level is increased by 4 levels. *Id.* § 3B1.1(a). If he was "a manager or supervisor (but not an organizer or leader)" of such criminal activity, his offense level is increased by 3 levels. *Id.* § 3B1.1(b). If he was "an organizer, leader, manager, or supervisor" in criminal activity involving fewer than five individuals that was not "otherwise extensive," his offense level is increased by 2 levels. *Id.* § 3B1.1(c).

█ The Government argues that Abiodun should receive a 2–level increase pursuant to Guidelines § 3B1.1(c) because he was "an organizer, leader, manager, or supervisor" in criminal activity involving at least two other participants—Julius Owolabi and Adekunle Olusola. I will apply the 2–level enhancement. Although the record does not demonstrate that Abiodun had a leadership role with respect to five or more individuals such as to warrant an increase of 3 or 4 levels pursuant to § 3B1.1(a) or (b), I am persuaded that he was an organizer, leader, manager, or su-

pervisor of criminal activity involving himself, Owolabi, and Olusola. He was one of Baptiste's biggest customers and engaged in substantial fraudulent activity. Clearly, he was assisted by both Owolabi and Olusola. Owolabi helped him try to obtain cash advances in Massachusetts, and Olusola helped him try to get a cash advance in Pennsylvania. The credit information for the two victims in question came through the TCI software, and Abiodun was the common link. Moreover, Abiodun gave Olusola ten credit reports, and promised to help Olusola call the banks. In other words, he had agreed to teach Olusola how to commit the fraud and, accordingly, was a supervisor or manager and should be sentenced accordingly.

## CONCLUSION

As set forth above, in calculating defendants' Guideline sentences, I will increase Abiodun's offense level 16 levels based on the loss amount and 2 levels based on his aggravating role; I will increase Akuetiemehe's offense level 16 levels based on the loss amount; and I will increase Akinyemi's offense level 6 levels based on the loss amount.

SO ORDERED.