06-5335-cr
USA v. Abiodun

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term, 2007

(Argued: May 20, 2008                                    Decided: July 30, 2008)

Docket No. 06-5335-cr

UNITED STATES OF AMERICA,

*Appellee*,

v.

EMMANUEL ABIODUN, also known as
ELEDUMA SUNDAY AWOLABI and
ATAIRU AKUETIEMEHE,

*Defendants-Appellants.*

Before: CARDAMONE, CABRANES, AND KATZMANN, *Circuit Judges.*

Defendants-appellants Emmanuel Abiodun and Atairu Akuetiemehe appeal the sentences imposed upon them by the United States District Court for the Southern District of New York (Denny Chin, *Judge*) following their pleas of guilty to fraud and various fraud-related offenses. On appeal, defendants challenge, *inter alia*, the District Court's determination of the number of victims affected by their conduct. We hold that the District Court incorrectly calculated the number of victims affected by defendants' conduct but we reject defendants' argument that an individual who is reimbursed for his economic loss cannot qualify as a victim under the number-of-victims enhancement set forth in section 2B1.1(b)(2) of the United States Sentencing Guidelines.

Affirmed in part, vacated in part, and remanded.

1

ANDREW H. FREIFELD, New York, NY, *for defendant-appellant Emmanuel Abiodun.*

Brian I. Kaplan, New York, NY, *for defendant-appellant Atairu Akuetiemehe.*

MARCUS ASNER, Assistant United States Attorney (Michael J. Garcia, United States Attorney, *on the brief*, Katherine Polk Failla and Jessica A. Masella, Assistant United States Attorneys, *of counsel*), United States Attorney's Office for the Southern District of New York, NY.

JOSÉ A. CABRANES, *Circuit Judge*:

Defendants-appellants Emmanuel Abiodun and Atairu Akuetiemehe appeal from judgments of conviction and the resulting sentences imposed upon them by the United States District Court for the Southern District of New York (Denny Chin, *Judge*) after they pleaded guilty to fraud in connection with identification documents, *see* 18 U.S.C. § 1028; fraud in connection with possession of a credit access device, *see* 18 U.S.C. § 1029; and conspiracy to commit fraud and wire fraud, *see* 18 U.S.C. § 371. Akuetiemehe was sentenced on October 30, 2006 principally to a term of 87 months' incarceration. Abiodun was sentenced on December 11, 2006 principally to a term of 96 months' incarceration.

Akuetiemehe challenges the District Court's determination that the loss amount attributable to his criminal activity was $1.2 to 1.6 million. Abiodun challenges the District Court's determinations that (1) his criminal activity involved more than 250 victims; (2) a two-level enhancement to his offense level—as calculated under the United States Sentencing Guidelines—was appropriate based on his role in the offense; and (3) the overlap of the Guidelines enhancements triggered by his offenses of conviction warranted a downward departure of only six levels. Abiodun also claims that the District Court failed to include, in the written order of

2

judgment and conviction, a statement of the reasons for its imposition of an above-Guidelines sentence.

We affirm the District Court's application of a two-level upward adjustment based on Abiodun's role in the offense and the District Court's decision to grant a six-level downward departure based on the overlap of the Guidelines enhancements triggered by Abiodun's offenses of conviction. We conclude, however, that the District Court incorrectly calculated the number of victims affected by defendants' conduct, an error which also affected the calculation of the loss attributable to the defendants. Accordingly, we vacate the sentences of both Akuetiemehe and Abiodun, and we remand the matter for further proceedings consistent with this opinion.

## I. Background

"Defendants were part of a loosely connected group of some thirty individuals who, over the course of five or six years, engaged in a scheme to commit credit card and access device fraud through the use of stolen credit information." *United States v. Abiodun*, 442 F. Supp. 2d 88, 90 (S.D.N.Y. 2006). One of the organizers of the scheme, Linus Baptiste, estimated that the members of the conspiracy "illegally downloaded more than 20,000 credit reports." *Id.* at 95. "Typically, four out of ten credit reports would be 'useful,' and a 'useful' credit report would yield approximately two usable credit cards or credit lines. A typical usable credit card would have an average of $5,000 in available credit." *Id.* at 93. "Put another way," the members of the conspiracy obtained an average of "approximately $4,000 per credit report." *Id.* at 96.

Defendant Akuetiemehe was involved in the scheme from 2002 to 2004, purchasing "a total of some 300 to 400 reports" from Baptiste. *Id.* at 94. In addition, "[a]t some point Akuetiemehe . . . was obtaining credit reports from a source other than Baptiste and selling them to others." *Id.* When he was apprehended in December 2004, he had "more than 200 credit reports as well as other

3

financial and bank documents, including documents bearing the name and photograph of a fraud victim . . . [and] list[ing] as an address the building in which Akuetiemehe lived at the time." *Id.* at 94-95.

Defendant Abiodun was involved in the scheme from late 2000 to early 2005. "He purchased approximately 400 to 500 credit reports," making him "one of Baptiste's biggest customers." *Id.* at 94 (record citations omitted). Abiodun provided another member of the group—Adekunle Olusola—with a credit card and drove Olusola from New York to Lancaster, Pennsylvania, where Olusola attempted to obtain "a cash advance on a credit card in the name of one of the victims of the fraud . . . using a false driver's license." *Id.* "Abiodun also gave Olusola approximately ten credit reports . . . [and] promise[d] to help Olusola call the banks" from which Olusola hoped to obtain credit. *Id.* (record citations omitted). Finally, Abiodun helped a second member of the group—Julius Owolabi—obtain "15 or more fraudulent credit cards, which were then used to get cash advances . . . [and] to buy merchandise." *Id.* (record citations omitted).

Defendants were sentenced under the theft and fraud provisions of the 2005 Sentencing Guidelines, which instruct a sentencing court to increase the offense level based on the amount of loss involved. *See* U.S.S.G. § 2B1.1 (2005). After defendants pleaded guilty to the charges in the indictment, the District Court held an evidentiary hearing pursuant to *United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978), to resolve the parties' disputes about, *inter alia*, the amount of loss attributable to each defendant.[1] The Government, in support of its position, presented the District Court with

---

[1] At the *Fatico* hearing, the District Court noted that defendants had agreed to be sentenced under previous editions of the Guidelines. The District Court further noted, however, that there appeared to be no material differences between those versions and the 2005 version of the Guidelines. *See Abiodun*, 442 F. Supp. 2d at 98 n.8.

spreadsheets indicating that the total losses arising from the scheme were over $25 million.[2]

To determine the loss amount attributable to each defendant, the District Court used the spreadsheets submitted by the Government and the testimony offered by cooperating witnesses to "calculat[e] the average loss sustained per credit report." *Abiodun*, 442 F. Supp. 2d at 100. The District Court then multiplied this sum by "the number of reports purchased by each defendant." *Id.* Using this methodology, the District Court concluded that (1) Akuetiemehe was responsible for losses of $1.2 to 1.6 million based on his purchase of 300 to 400 reports and (2) Abiodun was responsible for losses of $1.6 to 2.0 million based on his purchase of 400 to 500 reports. *Id.* at 101. In light of these loss calculations, the Court increased the offense levels of both defendants by 16 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(I). *Id.* at 102.

The District Court sentenced Akuetiemehe to a term of 87 months, the bottom of his Guidelines-recommended range of 87 to 108 months.

---

[2] In order to calculate the losses associated with the scheme, the Government

> sent out some 26,000 letters to [individuals whose personal information had been compromised,] requesting information to help calculate the extent of the losses from the credit card fraud and identity theft. Some 9,000 letters were returned as undeliverable, in part because some people had moved with the passage of time and some of the addresses were fraudulent addresses employed by members of the group. The Government received 1,209 responses.

*Abiodun*, 442 F. Supp. 2d at 95 (record citations omitted).

The 1,209 victims who responded to the Government's requests for information indicated that they had suffered "a total loss . . . of $13,328,471.47, or an average loss per victim . . . of $11,024.38." *Id.* (record citations omitted). In addition to the losses attributable to these victims, the Government uncovered an additional $15,299,673.74 in losses by issuing subpoenas to certain banks and credit card companies where fraud had been reported. *Id.* at 96.

> With the information attributable to the 1,209 victims who responded . . . eliminated to avoid double-counting, the spreadsheet shows an additional $15,299,673.74 in losses for the subpoenaed companies that provided usable information. This number does not include losses sustained by banks that were not subpoenaed or losses sustained by Best Buy and Home Depot, even though these companies were targets, because of difficulties in securing compliance with the subpoenas. Some [targets of the scheme], such as Dell and Gateway, simply were not contacted.

*Id.* at 95-96 (record citations omitted). The District Court determined that the estimate of actual loss arrived at in this manner likely "grossly understated" the losses associated with defendants' fraud in light of the fact that the vast majority of victims did not respond to the Government's attempts to contact them. *Id.* at 100.

Turning to Abiodun, the Court applied a six-level enhancement to the offense level based on the number of victims it found to have been affected by his conduct. Having concluded that lost time could constitute "actual loss" within the meaning of U.S.S.G. § 2B1.1, the District Court found that the victims affected by Abiodun's crimes included individuals who had spent an appreciable amount of time securing reimbursement for their financial losses from their banks or credit card companies. Taking these individuals together with the "dozens" of corporate victims and the "small percentage of individuals who actually did lose money," the District Court determined that it was "more likely than not" that Abiodun's crimes affected "250-plus victims, that is, victims who suffered some . . . harm that is monetary or that otherwise is readily measurable in money." App. 798-99.

The District Court also determined that Abiodun's offense level should be adjusted upward by two levels, pursuant to U.S.S.G. § 3B1.1(c), upon finding that Abiodun "was 'an organizer, leader, manager, or supervisor' in criminal activity involving at least two other participants." *Abiodun*, 442 F. Supp. 2d at 101-02. The District Court based this finding on, *inter alia*, record evidence concerning the role that Abiodun had played in the offenses of Owolabi and Olusola by providing them with credit information, credit access devices, and other types of assistance. *Id.*

In arriving at Abiodun's Guidelines-recommended sentencing range, the District Court determined that several of the Guideline enhancements triggered by Abiodun's conduct overlapped to some extent.[3] The District Court therefore decided to depart downward by six levels, leaving Abiodun with a total offense level of twenty-seven and a resulting Guideline range of 70 to 87 months.

---

[3] The District Court made specific reference to the enhancements related to "receiving and selling stolen properties, use of sophisticated means, [and] trafficking in five or more identification devices" as resulting in "a lot of overlap." App. 807.

6

After considering the seriousness of Abiodun's offense, the number of victims affected, and the fact that Abiodun "played a more significant role than virtually all of the other[]" individuals involved in the scheme, the District Court decided to impose a sentence of 96 months' imprisonment. App. 818. This sentence was (1) above Abiodun's post-departure Guidelines-recommended range of 70-87 months' imprisonment but (2) well below the 135 to 168 months' imprisonment that Abiodun would have faced had the District Court not granted him a six-level downward departure.

## II. Discussion

"[W]e review a district court's conclusions of law *de novo*, its application of the Guidelines on issues of fact for clear error, and its exercise of discretion with respect to departures for abuse of that discretion." *United States v. Ebbers*, 458 F.3d 110, 126 (2d Cir. 2006). A sentencing court's findings of facts, such as a finding concerning a defendant's role in criminal activity, "will not be overturned unless clearly erroneous." *United States v. Soto*, 959 F.2d 1181, 1187 (2d Cir. 1992) (citation and internal quotation marks omitted); *accord United States v. Gomez*, 31 F.3d 28, 31 (2d Cir. 1994). "A finding is clearly erroneous when[,] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Iodice*, 525 F.3d 179, 185 (2d Cir. 2008) (quoting *United States v. Sash*, 396 F.3d 515, 521 (2d Cir. 2005)).

## A. Loss amount

On appeal, Akuetiemehe renews his claims that the District Court's methodology for calculating the loss amount attributable to him was flawed. He contends that the District Court should have tried to ascertain (1) whether "any . . . of the credit reports Akuetiemehe possessed was ever used by him or anyone else to receive any goods or money," Akuetiemehe Br. 11, and (2) what

Akuetiemehe gained from participation in the scheme. He notes, in particular, the absence of any findings in the record regarding the average loss associated with the credit reports that he personally purchased or possessed. In light of the application notes to the theft and fraud Guidelines under which defendants were sentenced, we conclude that Akuetiemehe's challenges to the District Court's loss calculation are unavailing.

Application note 3 provides that, for purposes of calculating the offense level associated with theft and fraud offenses, "[t]he court need only make a *reasonable estimate* of the loss" resulting from the defendant's crime. U.S.S.G. § 2B1.1 cmt n.3(C) (2005) (emphasis added); *accord Ebbers*, 458 F.3d at 126; *United States v. Bryant*, 128 F.3d 74, 76 (2d Cir. 1997). The note also observes that, because "[t]he sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence[,] . . . the court's loss determination is entitled to appropriate deference." *Id.* With respect to the methodology for calculating the loss, the note states only that "[t]he estimate of the loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as . . . [t]he approximate number of victims multiplied by the average loss to each victim." U.S.S.G. § 2B1.1 cmt n.3(C)(iii). The note further provides that "the gain that resulted from the offense [may be used] as an alternative measure of loss only if there is a loss *but it reasonably cannot be determined*." *Id.* cmt n.3(B) (emphasis added).

We defer to the District Court's determination that this is not a situation where the loss associated with defendants' offenses "reasonably cannot be determined,"[4] *id.*, and conclude that the District Court appropriately looked to the losses suffered by the victims of the fraud rather than any gains enjoyed by Akuetiemehe. We further conclude that, in light of the application note's

---

[4] Such a situation could arise, for example, where authorities are unable to identify any victims of a fraud offense and, therefore, cannot ascertain the losses they suffered.

8

observation that a district court may *estimate* loss by multiplying the "*approximate* number of victims" by "the *average* loss to each victim," *id.* cmt n.3(C)(iii) (emphasis added), the District Court did not err in (1) using aggregate figures to estimate the average loss per credit report (a proxy for the average loss per victim) and (2) estimating the number of victims affected by Akuetiemehe's conduct by referring to the number of credit reports Akuetiemehe purchased, rather than conducting a separate hearing to determine (a) how many of these particular reports were actually exploited and (b) to what extent.

**B. The number of victims affected by defendants' conduct**

The application notes to section 2B1.1 define the "victims" of a fraud or theft offense to include "any person who sustained any part of the actual loss determined under subsection (b)(1)," *Id.* cmt n.1, where "'[a]ctual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense," *id.* cmt n.3(A)(i), and "'[p]ecuniary harm' means harm that is monetary or that otherwise is readily measurable in money," *id.* cmt n.3(A)(iii); *see also id.* (noting that "pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm").[5]  Abiodun objected at the sentencing hearing to the District Court's conclusion that his offenses affected more than 250 victims and its resulting imposition of a six-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(2). Relying on the Sixth Circuit's decision in *United States v. Yagar*, 404 F.3d 967 (2005), he contended that individuals whose identities were stolen but "who were fully reimbursed for the[ir] financial losses cannot be deemed victims for purposes of the adjustment at [section] 2B1.1(b)(2)." App. 792.  The Government disagreed with Abiodun on the basis of the reasoning set forth by the Eleventh Circuit in *United States v. Lee*, 427 F.3d 881 (11th Cir. 2005), which holds that individuals who were ultimately

---

[5] We also note that the application notes to section 2B1.1 specifically state that, in cases involving procurement fraud, "reasonably foreseeable pecuniary harm shall be considered to include . . . . the reasonably foreseeable administrative costs" incurred in the course of correcting the effects of the fraud. *See* U.S.S.G. § 2B1.1 cmt n.3(A)(v).

reimbursed for their financial losses can constitute victims for the purposes of U.S.S.G. § 2B1.1(b)(2). The parties renew these arguments on appeal.

We conclude that individuals who have been fully reimbursed for their financial losses may be deemed victims for purposes of the sentencing enhancement set forth at U.S.S.G. § 2B1.1(b)(2). In doing so, however, we need not reject the Sixth Circuit's reasoning in *Yagar*.

Abiodun is correct to observe that the Sixth Circuit, in *Yagar*, held that individuals "who only temporarily lost funds . . . because their banks reimbursed them for their losses" were not "victims" for purposes of U.S.S.G. § 2B1.1(b)(2). 404 F.3d at 971. Nevertheless, in relying on *Yagar*, Abiodun overlooks the Sixth Circuit's qualifying explanation that "there may be situations in which a person could be considered a 'victim' under the Guidelines even though he or she is ultimately reimbursed." *Id.* The key factor, according to the Sixth Circuit, is whether a potential victim "suffered [an] adverse effect as a practical matter from [the defendant's] conduct." *Id.* In *Yagar*, the Sixth Circuit determined that this requirement had not been met because "the monetary loss [was] short-lived and immediately covered by a third-party" such that the individuals whose identities were stolen did not suffer any "actual loss" or "pecuniary harm." *Id.*

*Lee* employs similar reasoning. In *Lee*, the Eleventh Circuit held that where "the monetary losses suffered by [parties who ultimately received reimbursement] were neither short-lived nor immediately covered by third parties" those parties could constitute victims for the purposes of U.S.S.G. § 2B1.1(b)(2) when their efforts to secure reimbursement were taken into account. 427 F.3d at 895. The Eleventh Circuit also noted the existence of a Guidelines provisions for "credits against loss," *see* U.S.S.G. § 2B1.1 cmt n.3(E), represented an "inherent . . . acknowledgment that there was in fact an initial loss, even though it was subsequently remedied by recovery of collateral or return of goods." 427 F.3d at 895.

We agree with the Sixth Circuit and Eleventh Circuit that individuals who are ultimately reimbursed by their banks or credit card companies can be considered "victims" of a theft or fraud offense for purposes of U.S.S.G. § 2B1.1(b)(2) if—as a practical matter—they suffered (1) an adverse effect (2) as a result of the defendant's conduct that (3) can be measured in monetary terms.[6] In the instant case, the District Court found that the individuals whose credit information defendants stole had to spend an appreciable amount of time securing reimbursement from their banks or credit card companies and determined that this "loss of time" could be measured in monetary terms.

Although the record clearly supports the District Court's underlying findings of fact concerning the individuals who could properly be considered victims of defendants' offenses, we nevertheless conclude that the District Court erred as a matter of law when including these individuals among the tally of defendants' victims because the losses attributable to these victims were not included in the loss calculation. The Guidelines' adjustment for the number of victims refers to the victims who sustained losses as determined by the loss calculation Guideline. *See* U.S.S.G. § 2B1.1 cmt n.1 (defining "victim" as "any person who sustained any part of the actual loss determined under subsection (b)(1)"); *cf. United States v. Leach*, 417 F.3d 1099, 1106-07 (10th Cir. 2005) (adopting a similar approach).[7] In the instant case, the District Court took lost time into account when calculating the

---

[6] Abiodun would have us look only to "the corporate creditors" who absorbed the financial charges associated with his fraud. Abiodun Br. 37. Acceptance of Abiodun's proposal, however, would mean that "[i]f credit information affecting hundreds of individuals is stolen from a single lender," the Guideline enhancements associated with multiple victims "will not apply, even if scores of individuals' accounts are accessed," so long as the costs of the fraud are ultimately borne by "the single institutional credit issuer." *United States v. Mohammed*, 315 F. Supp. 2d. 354, 362 n.6 (S.D.N.Y. 2003). Such an approach would "less accurately measure[] the extent of the fraud than a rule that calculates the number of [individuals adversely affected by] the scheme." *Id.* Accordingly, we reject the approach that Abiodun proposes in favor of the test set forth above.

[7] When presented with a similar issue, the Tenth Circuit observed:

[T]he only relevant definition of "Victim" is "any person who sustained any part of *the actual loss determined under subsection (b)(1)[.]*" *Id.* cmt. n. 1 (emphasis added). "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* cmt. n. 3(A)(i). While we agree that the cost of sending in replacement checks was a reasonably foreseeable pecuniary harm of Defendant's conduct, this harm was not included as part of the actual loss "determined under subsection (b)(1)." *Id.* cmt. n. 1. There was no testimony presented at the sentencing hearing regarding the type and amount of loss suffered by [the original

11

number of victims affected by defendants' conduct but failed to include the monetary value of this lost time when calculating the actual loss resulting from defendants' offenses.

Because this error affected the loss calculation of both defendants, we must vacate both sentences so that, on remand, the District Court can (1) recalculate the loss amount associated with each of the defendants' crimes to include the time lost by these potential victims *or* (2) determine whether, if these individuals are excluded from the count, it is still "more likely than not" that Abiodun's crimes affected "250-plus victims." App 798-99.

## C. Abiodun's role in the conspiracy

Abiodun disputes the District Court's interpretation of the evidence concerning his role in the scheme, contending that the interactions between (1) Abiodun and Owolabi and (2) Abiodun and Olusola were cooperative rather than hierarchical. As we have noted however, "where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Iodice*, 525 F.3d at 185 (quoting *Sash*, 396 F.3d at 521). Because (1) the District Court's finding as to Abiodun's role was firmly anchored in record evidence and (2) Abiodun disputes only the interpretation of this evidence, we decline to disturb the District Court's application of a two-level upward adjustment for a leadership role in the scheme pursuant to U.S.S.G. § 3B1.1(c).

## D. The six-level downward adjustment of Abiodun's offense level

On appeal, as at sentencing, Abiodun contends that the District Court should have granted him a departure of more than six levels based on the overlap of the enhancements applied to his

---

check writers]. Rather, the court's calculation of the actual loss was merely an estimation of the amount of funds Defendant intended to take from [the check payees]. That calculation did not include any estimation of "replacement costs" incurred by [check writers] who sent in additional checks.

Because the loss suffered by the[] 200 [check writers] was not part of the actual loss determined by the court under U.S.S.G. § 2B1.1(b)(1)(F), the district court erred by counting the [check writers] as "victims" for the purposes of an enhancement under U.S.S.G. § 2B1.1(b)(2).

*United States v. Leach*, 417 F.3d 1099, 1106-07 (10th Cir. 2005).

offense level.

"[T]he cumulation of . . . substantially overlapping enhancements, when imposed upon a defendant whose adjusted offense level translates to a high sentencing range, presents a circumstance that is present to a degree not adequately considered by the Commission and therefore permits a sentencing judge to make a downward departure." *United States v. Lauersen*, 348 F.3d 329, 344 (2d Cir. 2003) (citations omitted). The decision about whether to grant such a departure is, therefore, discretionary. *See, e.g., Lauersen*, 348 F.3d at 344 (noting that "[u]pon remand, . . . [the district court] may exercise discretion to mitigate the effect of [an overlapping] enhancement by making a downward departure"); *United States v Kilkenny*, 493 F.3d 122, 131 (2d Cir. 2007) ("Although we noted in *Lauersen* that there is a substantial overlap between the two enhancements that might justify a downward departure in some circumstances, any such departure would be discretionary." (internal citation omitted)).

The record provides no indication that the District Court's decision not to grant Abiodun a more substantial downward departure (1) rested on "an error of law []such as application of the wrong legal principle[];" (2) was based on "a clearly erroneous factual finding"; or (3) "cannot be located within the range of permissible decisions." *See, e.g., Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001) (noting that a district court "'abuses' or 'exceeds' the discretion accorded to it" when one or more of these conditions is met); *accord United States v. Tsekhanovich*, 507 F.3d 127, 129 (2d Cir. 2007). Accordingly, it cannot be said that the District Court exceeded its discretion when it decided to grant Abiodun a downward departure of only six levels.

**E. Statement of reasons**

Abiodun contends that the District Court failed to include in the "'written order of judgment and commitment' filed in this case . . . any reason, no less any 'specific reason' . . . for the imposition of an above-the Guidelines range sentence." Abiodun Br. 64. This claim is clearly contradicted by the

13

"statement of reasons" form filed with the judgment and commitment, in which the District Court stated that an above-Guidelines sentence was necessary due to the "seriousness of [the] crime; impact on [the] victims, including non-monetary impact; [Abiodun's] relative culpability as compared to [his] co-defendants; and [Abiodun's] role [in the offense]." Gov't Addendum 16. Accordingly, we reject the claim.

## III. Conclusion

We affirm the District Court's application of a two-level upward adjustment based on Abiodun's role in the offense and a six-level downward departure based on the overlap of the Guidelines enhancements triggered by Abiodun's offenses of conviction. Nevertheless, for the reasons given above, *see ante* Part II.B, we vacate the sentences imposed by the District Court and direct the District Court, on remand, to (1) recalculate the loss amount associated with defendants' crimes to include lost time *or* (2) determine whether, if individuals whose losses ultimately consisted only of lost time are excluded from the count, it is still "more likely than not" that Abiodun's crimes affected "250-plus victims." App 798-99.