

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-4-2009

# USA v. Dianne Kennedy

Precedential or Non-Precedential: Precedential

Docket No. 08-1172

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"USA v. Dianne Kennedy" (2009). *2009 Decisions.* Paper 1808.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1808

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No.  08-1172

———

UNITED STATES OF AMERICA,

v.

DIANNE L.  KENNEDY,

Appellant.

———

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No.: 06-cr-00030)
District Judge:  Honorable Terrence F. McVerry

———

Argued October 1, 2008
Before: FISHER, CHAGARES and HARDIMAN, *Circuit
Judges*.

(Filed: February 4, 2009 )

Robert L. Eberhardt (Argued)
Office of the United States Attorney
700 Grant Street

Suite 4000
Pittsburgh, PA 15219
  *Attorney for Appellee*

Karen S. Gerlach (Argued)
Office of Federal Public Defender
1001 Liberty Avenue
1450 Liberty Center
Pittsburgh, PA 15222
  *Attorney for Appellant*

---

## OPINION OF THE COURT

---

HARDIMAN, *Circuit Judge*.

Dianne Kennedy appeals the District Court's judgment of sentence following her pleas of guilty to ten counts of an indictment. Kennedy challenges three enhancements pursuant to the United States Sentencing Guidelines (Guidelines or USSG). The application of one of those enhancements — the number of victims pursuant to USSG § 2B1.1(b)(2) — has challenged trial and appellate courts because the language of the enhancement and its commentary define "victim" more narrowly than the commonsense understanding of that term. We hold that we are bound by the clear language of the Guidelines, and find that only those who are actually harmed by the crime can be counted as victims for purposes of USSG § 2B1.1(b)(2). Our

finding that the § 2B1.1(b)(2) enhancement does not apply does not mean that Kennedy's crime is not serious. Under the post-*Booker* sentencing framework, the Guidelines are advisory and district judges must use their discretion to ensure that each sentence is commensurate with the crime.

I.

From September 1999 to August 2001, Dianne Kennedy worked as a representative payee liaison for Ursuline Services, Inc., a non-profit corporation that assists the elderly in Pittsburgh, Pennsylvania.[1] As a representative payee, Ursuline managed funds payable to beneficiaries of the Social Security Administration, the Department of Veterans Affairs, and the Railroad Retirement Board who were unable to manage their own financial affairs. In this capacity, Ursuline received benefit payments, held funds in trust, and made disbursements to cover beneficiaries' expenses, such as rent, utilities, and food. For example, if PNC Bank notified Ursuline of a deposit by a government program in the name of a specific beneficiary, that amount would be added to the internal Ursuline account for that individual. The representative payee liaison would then write checks from the internal account to cover the beneficiary's living expenses. Thus, in fulfilling her duties, Kennedy was aware of the beneficiary's account balances and oversaw their

---

[1] From August 2001 until December 2001, Kennedy was reassigned to the guardian section where she performed "guardian of the prison" duties rather than fiduciary duties. She was terminated in December 2001.

3

financial transactions. From February 2, 2001 to April 9, 2001, Kennedy wrote checks, mostly payable to cash, from the accounts of 34 beneficiaries. Ursuline and its insurer, Zurich American Insurance Company, fully replenished the accounts that Kennedy looted.

Kennedy was indicted on four counts of mail fraud in violation of 18 U.S.C. § 1341, and six counts of making and using false writings or documents in violation of 18 U.S.C. § 1001(a)(3). Kennedy promptly pleaded guilty and the Probation Office issued a Presentence Investigation Report (PSR), which calculated an advisory Guidelines imprisonment range of 21 to 27 months based on an adjusted total offense level of 15 and a criminal history category of II. Although Kennedy's base offense level was only six, the Probation Office found her subject to four enhancements: (1) six points for the amount of loss ($54,321.12), USSG § 2B1.1(b)(1)(D); (2) two points for ten or more victims, USSG § 2B1.1(b)(2)(A); (3) two points for vulnerable victims, USSG § 3A1.1(b)(1); and (4) two points for abusing a position of trust, USSG § 3B1.3.

At sentencing, Kennedy did not challenge the amount of loss, but she objected to the other three sentencing enhancements. First, she claimed that her only victims were Ursuline and Zurich, which rendered the enhancement for ten or more victims inappropriate. Second, Kennedy argued that because Ursuline and Zurich were the only victims, they did not qualify as "vulnerable victims" under the Guidelines. Finally, Kennedy disputed the application of the abuse of a position of trust enhancement.

4

In addition, Kennedy argued that her criminal history category of II was inaccurate because it was based on an offense that occurred after the instant offense. Finally, she requested a downward variance and a mitigated sentence of twelve months and one day because she was the sole provider for her mother and mentally challenged granddaughters.

The District Court rejected Kennedy's objections to the sentencing enhancements, as well as her request for a variance on the basis of her family circumstances. The District Court held a sentencing hearing and reduced Kennedy's criminal history category to I, thereby adjusting her Guidelines imprisonment range to 18 to 24 months. Kennedy was sentenced to 18 months imprisonment and three years of supervised release, and was ordered to pay restitution to Ursuline ($29,321.12) and Zurich ($25,000).

II.

In this appeal, Kennedy challenges the same three enhancements to which she objected at sentencing. She also claims that the District Court applied the wrong legal standard in denying her request for a variance.

The District Court's interpretation of the Sentencing Guidelines is subject to plenary review. *United States v. Moorer*, 383 F.3d 164, 167 (3d Cir. 2004). We review findings of fact that support Guidelines enhancements for clear error. *See United States v. Grier*, 475 F.3d 556, 569 (3d Cir. 2007) (en banc). We review the sentence itself for reasonableness under an abuse of discretion standard. *United States v. Gunter*, 527

F.3d 282, 284 (3d Cir. 2008) (citing *Gall v. United States*, 128 S. Ct. 586, 597-98 (2007)).

III.

A.

We begin by considering whether the District Court erred in finding that each of the 34 individual account holders was a victim under § 2B1.1(b)(2)(A) of the Guidelines. Although these 34 elderly and incapacitated clients would satisfy a commonsense or dictionary[2] definition, our task here is to determine whether they are deemed victims under the Sentencing Guidelines' definition. If, as here, "a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning." *See Biskupski v. Attorney General*, 503 F.3d 274, 280 (3d Cir. 2007) (citing *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000)); *see also Meese v. Keene*, 481 U.S. 465, 484 (1987) (recognizing "the respect we normally owe to the Legislature's power to define the terms that it uses in legislation"); *Lawson v. Suwannee Fruit & S.S. Co.*, 336 U.S. 198, 201 (1949) ("Statutory definitions control the meaning of statutory words . . . ."). Additionally, "where a definition informs what a particular term "means," that

_____

[2]*See, e.g.,* Oxford English Dictionary (2d ed. 1989) (defining "victim" as "one who suffers some injury, hardship, or loss, is badly treated or taken advantage of, etc."); Black's Law Dictionary (8th ed. 2004) (defining "victim" as "a person harmed by a crime, tort, or other wrong").

definition will include whatever express meanings follow." *Biskupski*, 503 F.3d at 280 (citing *Colautti v. Franklin*, 439 U.S. 379, 392 n.10 (1979) ("As a rule, [a] definition which declares what a term 'means' . . . excludes any meaning that is not stated.") (quotation marks and citation omitted), overruled in part on other grounds by *Webster v. Reproductive Health Servs.*, 492 U.S. 490 (1989)).

The critical word — "victim" — is defined in the commentary as "any person who sustained any part of the actual loss . . . ." *See* USSG § 2B1.1(b)(2), cmt. n. 1. "Actual loss," in turn, is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." *See* cmt. n. 3(A)(i). Application Note 3(A)(i) explains that "'pecuniary harm' means harm that is monetary or that otherwise is readily measurable in money," and "does not include emotional distress, harm to reputation, or other non-economic harm." *Id.* at cmt. n.3(A)(iii). Additionally, certain damages are specifically excluded from "loss," such as "[i]nterest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs." *See* cmt. n. 3(D)(i).

Kennedy admitted to stealing from 34 individual accounts. It is undisputed, however, that those account holders did not "sustain[] any part of the actual loss" because they were reimbursed by Ursuline and Zurich. Indeed, the Government failed to meet its burden to prove that the account holders even knew that their funds had been stolen before they were completely reimbursed by Ursuline and Zurich. Because Ursuline and Zurich were the only parties who suffered any pecuniary harm — which is a prerequisite for being deemed a

7

"victim" under § 2B1.1(b)(2) — they are the only "victims" under the Guidelines. Accordingly, we hold that the District Court committed legal error when it held that the 34 account holders were "victims" under USSG § 2B1.1(b)(2)(A) despite suffering no pecuniary harm.

B.

Our interpretation of § 2B1.1(b)(2)(A) of the Guidelines is consistent with *United States v. Yagar*, 404 F.3d 967 (6th Cir. 2005), *United States v. Icaza*, 492 F.3d 967 (8th Cir. 2007), and *United States v. Conner*, 537 F.3d 480 (5th Cir. 2008).

In *Yagar*, the defendant used stolen checks to deposit in excess of $88,000 into more than 50 individual accounts at five banks. 404 F.3d at 988. Yagar then withdrew portions of the deposited funds from 47 of those accounts, receiving over $20,000 in cash. *Id.* Although the parties agreed that the five banks were victims, the Government argued that the account holders were also victims. *Id.* at 971. Analyzing § 2B1.1(b)(2), the Sixth Circuit rejected the Government's argument, finding that the account holders did not suffer an "actual loss" because "they were fully reimbursed for their temporary financial losses." *Id.*

In *Icaza*, the defendants traveled across the country stealing from Walgreens stores. 492 F.3d at 968-69. The district court counted each of the approximately 400 stores that were robbed as a "victim" under § 2B1.1(b)(2). *Id.* at 969. On appeal, the defendants argued that only the Walgreens corporation was a "victim" under USSG § 2B1.1(b)(2). The

8

Court of Appeals for the Eighth Circuit agreed, stating that "only the Walgreens corporation sustained an actual loss" because no individual Walgreens store "ultimately bore the pecuniary harm." *Id.* This conclusion was supported by the fact that the restitution order required payments to be made to the Walgreens corporation, not to individual stores. *Id.* at 969. Thus, under the Eighth Circuit's analysis, if an individual does not ultimately sustain any pecuniary harm, he cannot be said to have suffered an "actual loss."

The Court of Appeals for the Fifth Circuit followed the logic of *Icaza* in *United States v. Conner*, 537 F.3d 480 (5th Cir. 2008). There, Conner used eBay to resell power tools purchased with gift cards that he bought with unauthorized credit accounts. *Id.* at 483. Because all of the account holders were reimbursed by their credit card companies, Conner argued that only the five credit card companies should be counted as victims. The district court disagreed and imposed a two-point enhancement under § 2B1.1(b)(2) based on the number of individual account holders, on the assumption that at least some of the defrauded cardholders had paid their bills before being reimbursed. The Fifth Circuit reversed, finding that because the individual accounts were all reimbursed, they had not suffered any pecuniary harm "that resulted from" the offense. *Id.* at 489.

Although the courts of appeals in *Yagar, Icaza,* and *Conner* held that each individual was not a "victim," two of those courts stated in *dicta* that an individual who was fully reimbursed might qualify as a "victim" under certain circumstances. The *Yagar* court noted that there "may be situations in which a person could be considered a 'victim'

9

under the Guidelines even though he or she is ultimately reimbursed." 404 F.3d at 971. The key factor, according to the Sixth Circuit, is whether a potential victim "suffered [an] adverse effect as a practical matter from [the defendant's] conduct." *Id.* On the facts of *Yagar*, however, "the monetary loss [was] short-lived and immediately covered by a third-party" such that the individuals whose identities were stolen did not suffer any "actual loss" or "pecuniary harm." *Id.* Likewise, the court in *Conner* left open the possibility "that with a proper evidentiary foundation these types of unreimbursed business losses could be considered 'actual losses' for the purposes of counting 'victims.'" 537 F.3d at 491.

The Second, Ninth and Eleventh Circuits have deemed individual account holders to be "victims" under USSG § 2B1.1(b)(2). *See United States v. Abiodun*, 536 F.3d 162 (2d Cir. 2008); *United States v. Pham*, 545 F.3d 712 (9th Cir. 2008); *United States v. Armstead*, - - F.3d - -, No. 06-30550, 2008 WL 5398999 (9th Cir. Dec. 30, 2008); *United States v. Lee*, 427 F.3d 881, 894 (11th Cir. 2005). We do not view this as a circuit split, however, as these opinions agreed with the principles established in *Yagar*, but found that the facts of each case fell within the *Yagar* carve-out for those who could be considered victims, despite ultimately being reimbursed, because they suffered some additional harm.

The Eleventh Circuit held that those who recover collateral, or who have their money or property returned, suffer a loss under the Guidelines when they are not fully reimbursed. *United States v. Lee*, 427 F.3d 881, 894 (11th Cir. 2005). *Lee* distinguished *Yagar* by observing that the *Yagar* account holders

10

were able to receive prompt reimbursement from their banks, whereas the creditors in *Lee* suffered foreclosures or other repossession processes to recoup losses, and even then the creditors were not fully reimbursed. *Id.* at 895. *Lee* is also distinguishable because restitution was made to the victims by the defendants themselves, not by a third party bank or credit card company, and then only after time-consuming efforts by the victims. *See id.* at 885-86.

Similarly, in *United States v. Pham*, the victims actively pursued reimbursement, despite being fully reimbursed. *Pham*, 545 F.3d at 712. In *Pham*, the defendant stole confidential information from fifty or more persons and used it to withdraw money from their accounts. The Ninth Circuit found that the theft of this personal information and withdrawal of money resulted in "reasonably foreseeable pecuniary harm" to those account holders, thus causing them to suffer "actual loss" within the meaning of the Guidelines. *Id.* at 716. In doing so, the Ninth Circuit relied on victim impact statements, which made clear that some account holders had to spend several weeks seeking reimbursement, and it rejected the argument that a victim must suffer additional pecuniary harm other than the reimbursed loss. *See id.* at 718. The Court agreed with the sentencing judge's conclusion that because some account holders spent time, effort, and money before receiving reimbursement, they were victims under § 2B1.1(b)(2).

The Ninth Circuit recently clarified its interpretation of § 2B1.1(b)(2) in *United States v. Armstead*, - - F.3d - -, 2008 WL 5398999, finding that it had to analyze the loss calculation to determine whether one was a victim. If a person suffered

11

pecuniary harm beyond the amount by which he was reimbursed (including harm related to time and effort of seeking reimbursement), then that amount should be included in the loss calculation, and that person would properly be considered a victim. *Id.* at *12. The court ultimately found that the enhancement for fifty or more victims could not apply because only the loss incurred by 16 victims was counted in the loss calculation. *Id.*

The Second Circuit has established a more expansive test than *Yagar* to determine whether individuals who are ultimately reimbursed by their banks or credit card companies can be considered "victims" under § 2B1.1(b)(2). *See United States v. Abiodun*, 536 F.3d at 168-69. Under this test, an individual is considered a victim if she suffered: "(1) an adverse effect (2) as a result of the defendant's conduct that (3) can be measured in monetary terms." *Id.*

In *Abiodun*, the defendant fraudulently obtained credit reports of more than 250 individuals and opened up new lines of credit in their names. The Second Circuit found that even though they were ultimately reimbursed, each individual was a victim because they "had to spend an appreciable amount of time securing reimbursement from their banks or credit card companies . . . and this 'loss of time' could be measured in monetary terms." *Id.* at 169. It also required that in order to be a "victim," the loss attributed to the person had to be counted in the loss calculation. It remanded the case for a determination of whether the loss attributed to the alleged victims could be counted as loss, or for a recalculation of the actual number of victims who suffered a loss under the calculation. The Second

12

Circuit also rejected the idea of counting only the creditors who absorbed the financial charges, because to do so would "less accurately measure the extent of the fraud than a rule that calculates the number of individuals adversely affected by the scheme." *Id.* at 169 n.6 (internal quotation marks and citation omitted).

We agree that had the Government shown that the account holders that Kennedy defrauded spent time or money seeking reimbursement, this would be a closer case. Because the record is devoid of any such evidence, however, we conclude that Ursuline and Zurich were Kennedy's only victims for purposes of § 2B1.1(b)(2).

C.

Because we find the *Yagar* line of cases faithful to the text of § 2B1.1 and its Application Notes, we adopt a similar interpretation of "victim" under the Guidelines. We recognize, however, that this interpretation is hard to reconcile with commonsense notions of what it means to be a victim. Nevertheless, our task is to adhere to the Guidelines and its Application Notes.

One criticism of our interpretation is that "actual loss" and "ultimate pecuniary harm" artificially count "victims" after the entire transaction has taken place. A second criticism, as explained by Judge Garza in his dissent in *Conner*, is that counting only the corporate entities as "victims" will betray the sentencing goals of the Guidelines by providing more lenient

13

sentences for more serious crimes. We find these objections illusory in the post-*Booker* sentencing world.

As for the first criticism, we agree that, as a matter of legislative policy, the determination of "actual loss" by reference to the end of the transaction ignores the fact that a party might suffer harm in the interim between the theft and restitution. Determining when to "stop the clock," however, was the Sentencing Commission's policy decision. The Sentencing Commission could have decided to stop the clock immediately after Kennedy wrote the checks, but it did not do so. Instead, the Commission defined "victim" in such a way that requires us to look to the net financial result of the crime rather than to take a financial snapshot at the inception of the crime or during its commission. Our interpretation is supported by Application Note 3(A)(i), which refers to "pecuniary harm that resulted from the offense," and plainly speaks in the past tense.

Regarding the second objection, we note that the dissent in *Conner* persuasively argued that construing "victim" to mean only the credit card companies but not those whose credit was stolen, violates the spirit of the Guidelines. 537 F.3d at 494 (Garza, J., dissenting). In Judge Garza's view, "by waiting until after reimbursement to measure 'pecuniary harm' and 'actual loss,' the majority's interpretation of the victim enhancement in § 2B1.1 runs counter to the fundamental sentencing goal of tying the severity of a defendant's sentence to the seriousness of the defendant's crime." *Id.* Judge Garza noted that courts should not interpret § 2B1.1 to allow a defendant who defrauds 1,000 individuals who are reimbursed by a single insurer to be

14

treated more leniently than one who defrauds 10 uninsured persons. *Id*.

Although Judge Garza's view would have tremendous force in a mandatory Guidelines regime, we do not share his concern in light of the broad sentencing discretion possessed by district judges since *Booker* was decided. It is true that the hypothetical he posed yields a lower Guidelines range for the criminal who defrauds 1,000 insured individuals than one who defrauds 10 uninsured persons, but this in no way requires that the more culpable criminal receive a more lenient sentence than the less culpable one. Since *Booker*, district judges have substantial discretion to impose sentences anywhere within the statutory range, as long as those sentences are reasonable under our deferential standard of review for abuse of discretion. We expect that district judges will examine the particular facts of each case in fashioning a just sentence without getting bogged down in formalistic technicalities. Sentencing is not a mathematical calculation; it is a human enterprise that requires wisdom, judgment, and old-fashioned common sense. To the extent the plain language of the Guidelines — including its Commentary and Application Notes — would lead to unfair results, we repose our confidence in district judges to apply fairly and justly the factors set forth in 18 U.S.C. § 3553(a), which may require variances from the Guidelines range.

Applying these principles to Kennedy's case, if the District Court had rejected the Government's request for a two-point enhancement under § 2B1.1(b), Kennedy's imprisonment range would have been 12 to 18 months. Thus, the actual sentence imposed by the District Court of 18 months still would

have been within the advisory Guidelines range. Moreover, the District Court was free to sentence Kennedy anywhere below the statutory maximum of five years for each of the four mail fraud counts, *see* 18 U.S.C. § 1341, and five years for each of the six counts of making a false writing, *see* 18 U.S.C. § 1001(a)(3). To deem essential the two-point enhancement under § 2B1.1(b)(2) is to elevate form over substance now that the Guidelines are no longer mandatory.

IV.

Kennedy next argues that the District Court erred when it imposed a two-point enhancement under USSG § 3A1.1(b)(1) because Ursuline and Zurich were not "vulnerable victims." Although we agree with Kennedy that the 34 elderly account holders from whom she stole did not satisfy the definition of "victim" under USSG § 2B1.1(b)(2), this does not mean that they are not "vulnerable victims" under USSG § 3A1.1(b)(1). We acknowledge this apparent *non sequitur* because a reasonable person would rightly wonder how one can be a *vulnerable victim* without being a victim at all. Here again, we note that we are interpreting the Guidelines rather than applying logic or common sense. Chapter 2 of the Guidelines is entitled "Offense Conduct" and controls the base offense level of the crime, whereas Chapter 3, entitled "Adjustments," contains a list of adjustments that increase the number of Guidelines points for aggravating factors such as the age of the victim or the use of a minor to commit a crime. Because these two chapters serve different purposes, the Sentencing Commission was free to define "victim" differently in each.

16

The vulnerable victim enhancement, which is part of Chapter 3, provides that "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels." USSG § 3A1.1(b)(1). "Vulnerable victim" is a person "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." *Id.* at cmt. n.2. We have previously held that victims can be particularly vulnerable if they are financially insecure, sick, in a state of emergency, or otherwise susceptible to the particular kind of criminal conduct at issue. *United States v. Zats*, 298 F.3d 182, 185 (3d Cir. 2002). As we stated in *Zats*, "victim status is not limited to those hurt by the offense of conviction, but also includes those hurt by relevant conduct outside that offense." *Id.* at 187. In addition, the Application Note to USSG § 3A1.1(b) states, in relevant part: "For purposes of subsection (b), 'vulnerable victim' means a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct) . . . ." USSG § 3A1.1, cmt. n.2. Section 1B1.3(a) includes the following as relevant conduct:

> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

> . . . .

> (3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all

17

harm that was the object of such acts and omissions . . . .

USSG § 1B1.3(a).

In *United States v. Cruz*, 106 F.3d 1134 (3d Cir. 1997), we found that "neither § 3A1.1(b) nor the application note explicitly requires that we read 'victim' narrowly and that, under § 1B1.3, we may look at all the conduct underlying the offense of conviction." *Id.* at 1137. We then applied the vulnerable victim enhancement where the defendant sexually assaulted a twelve-year-old victim while stealing a car, but pleaded guilty only to a carjacking charge. *Id*; *see also United States v. Monostra*, 125 F.3d 183, 189 (3d Cir. 1997) ("[T]he drafters of the Sentencing Guidelines did not intend to limit the application of § 3A1.1(b) to situations in which the vulnerable person was the victim of the offense of conviction. Rather, trial courts may look to all the conduct underlying an offense, using § 1B1.3 as a guide.") (citation omitted).

In light of the foregoing, the fact that Ursuline and Zurich are the only "victims" under the number-of-victims enhancement (USSG § 2B1.1) is immaterial to the question whether they are vulnerable victims under § 3A1.1(b). The Guidelines make clear that "victims" under § 2B1.1 and § 3A1.1(b) are separate definitions.

Because we are not bound by the definition of "victim" in § 2B1.1, to determine the applicability of USSG § 3A1.1(b), we consider whether:

18

> (1) the victim was particularly susceptible or vulnerable to the criminal conduct; (2) the defendant knew or should have known of this susceptibility or vulnerability; and (3) this vulnerability or susceptibility facilitated the defendant's crime in some manner; that is, there was a "nexus between the victim's vulnerability and the crime's ultimate success."

*United States v. Iannone*, 184 F.3d 214, 220 (3d Cir. 1999) (citation omitted).

Kennedy does not argue that her victims were not particularly susceptible or vulnerable to her criminal conduct. Instead, she attempts to distinguish herself from Iannone by noting that she was not in any personal contact with the account holders and by describing her crime as "office accounting manipulations." In doing so, Kennedy mistakenly equates lack of personal contact with ignorance of the account holders' vulnerability. In fact, Kennedy was well aware that the account holders she defrauded were unable to manage their own finances since their incapacity was the very reason for her stewardship of their accounts. Nor are we persuaded by Kennedy's argument that the account holders' inability to handle their own affairs merely provided her with the *opportunity* to commit the crime as opposed to *facilitating* it, as required by the third prong of *Iannone*. Accordingly, the District Court did not err when it applied the vulnerable victim enhancement to Kennedy's sentence.

V.

19

Kennedy next objects to the District Court's two-point enhancement under USSG § 3B1.3 for abuse of a position of trust. In *United States v. Pardo*, 25 F.3d 1187, 1192 (3d Cir. 1994), we considered three factors in determining whether a defendant occupies a position of trust:

> (1) whether the position allows [the] defendant to commit a difficult-to-detect wrong; (2) the degree of authority which the position vests in the defendant vis-à-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of the person occupying the position.

*Id.* These factors should be considered to "punish 'insiders' who abuse their positions rather than those who take advantage of an available opportunity." *Id.*

The Probation Office noted in Kennedy's PSR: "[a]s an account manager assigned to oversee the finances of a particular group of clients; [Kennedy] breached her fiduciary responsibilities and used her position to facilitate the commission of the offense." The District Court accepted this recommendation and found that Kennedy had "unique access" to the accounts of her clients, who were unable to manage their own affairs. We have little difficulty concluding that Kennedy was an "insider" who took advantage of her access to client accounts. Kennedy's claim that neither Ursuline nor its clients placed special reliance upon her is specious because she was responsible for managing her clients' finances. The District Court correctly applied the *Pardo* factors and did not err when

20

it applied the sentencing enhancement for abuse of a position of trust.

VI.

In addition to challenging the three Guidelines enhancements, Kennedy claims that the District Court's 18-month sentence was unreasonable because she was entitled to a sentence of 12 months and one day in light of her family circumstances. In support of this argument, Kennedy claims that the District Court was unfaithful to *Gall*, where the Supreme Court rejected a rule that would have required "extraordinary circumstances" to justify a sentence outside of the Guidelines range. *Gall,* 128 S.Ct. at 595.

Contrary to Kennedy's argument, the District Court did not believe that extraordinary circumstances were required to warrant a variance. In its tentative findings, after noting that Kennedy's family circumstances were unfortunate, the District Court stated: "the hardship claimed by Kennedy is similar to that experienced by many if not most families of convicted felons, and . . . the facts of this case are not so exceptional or outside the 'heartland' as to warrant departure or variance from the guidelines."

The District Court's observations that Kennedy's case was neither out of the ordinary nor dissimilar to that of other felons did not violate *Gall*. The record demonstrates that the District Court understood its ability to vary downward and chose not to do so after finding that the sentence proposed by Kennedy was too lenient. As the Government argues, there is nothing in

21

the record to indicate how a sentence of 12 months and one day would have met the needs of Kennedy's family in ways that 18 months in prison would not. This is especially true in light of the 15-month sentence Kennedy served during 2005 and 2006. Unfortunately for those family members who depend on Kennedy, they will once again be forced to suffer the consequences of her criminal conduct.

In sum, we reject Kennedy's tacit invitation to hold that a below-Guidelines sentence is required in the ordinary or typical case. Such a holding would not only be inconsistent with *Gall*, but would severely restrict the discretion afforded to sentencing judges pursuant to 18 U.S.C. § 3553(a) in the wake of *Booker* and its progeny.

## VII.

The District Court did not abuse its discretion when it found Kennedy subject to sentencing enhancements for "vulnerable victim," USSG § 3A1.1(b)(1), and abuse of a position of trust, USSG § 3B1.3. Nor did the District Court err in rejecting Kennedy's request for a downward variance pursuant to 18 U.S.C. § 3553(a). However, we find that the District Court committed procedural error when it increased Kennedy's total offense level by two points under USSG § 2B1.1(b)(2)(A). Although this procedural error requires that the case be remanded to the District Court for resentencing, we reiterate our view that the District Court's technical miscalculation does not negate the fact that Kennedy took advantage of 34 clients who were unable to manage their own affairs. The District Court may consider this fact in analyzing

22

the factors set forth in 18 U.S.C. § 3553(a) and is free to impose the same sentence, or a different one, as it deems just and proper.