[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-15924

_____

D.C. Docket No. 2:11-cr-14051-JEM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALFRED ROBERT MASSAM,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 6, 2014)

Before CARNES, Chief Judge, WILSON, Circuit Judge, and DALTON,[*] District
Judge.

CARNES, Chief Judge:

_____

[*] Honorable Roy B. Dalton, Jr., United States District Judge for the Middle District of
Florida, sitting by designation.

The truth of Alexander Pope's observation that "[h]ope springs eternal in the human breast,"[1] can often be seen in matters of matrimony.  Unfortunately for the defendant in this case, what sprang from his fifth matrimonial go round was a substantial property award to his fifth ex-wife.  From that award sprang his embezzlement of the pension funds of his employees and his sentence of imprisonment for that crime.  From that sentence sprang this appeal, filed in the hope of a lesser sentence.  That hope, like the hopes that motivate many multiple matrimonies, will not be realized.

I.

Dr. Alfred Massam was an orthopedic surgeon in Sebring, Florida.  In 1980 he set up two pension plans to provide retirement benefits for himself and the employees of his surgical practice.  He served as the Employee Retirement Income Security Act administrator and trustee for both pension plans.  In 2005 he and his fifth wife were divorced.  The state court on March 9, 2005 entered two distribution orders allocating to his ex-wife $64,216 of his share in one of the pension plans and $388,026 of his share in the other plan, for a total of $452,242 of those funds.

---

[1] "Hope springs eternal in the human breast/Man never is, but always to be blessed/The soul, uneasy and confined from home/Rests and expiates in a life to come." Alexander Pope, "An Essay on Man."

2

Massam then attempted to improperly transfer all of the funds, a total of $1,185,862.32, from both of the pension plans, into a foreign bank account from which he could withdraw them. In August of 2005, he wired the funds from the accounts in which they were held at a local bank to the Anglo Irish Bank in Austria. His plan was thwarted when, on October 7, 2005, the Austrian bank wired the funds back to the local bank because Massam had failed to adequately document their source. The funds went back into the pension plan accounts from whence they came.

Soon thereafter, Massam made several investments on behalf of the pension plans. On October 12, 2005, he placed $533,054.91 from one of the pension funds into a brokerage investment account with FSC Securities Corporation, and he invested another $350,000 from that same pension fund in the Hanover Corporation, LLC. The investment in the Hanover Corporation was entirely lost because it turned out to be an illegal Ponzi scheme, although there is no evidence that Massam was aware of that at the time he invested the money.

On November 17, 2005, Massam appealed the final judgment in the divorce, including the asset distribution orders. In order to file that appeal, he posted a supersedeas bond in the amount of $656,341, which covered, among other things, the $452,242 of the pension funds that he had been ordered to pay his ex-wife. There is no evidence in the record (as distinguished from assertions of counsel)

3

identifying the source of the money Massam used to purchase that bond. In any event, from 2006 to 2010 Massam improperly diverted to his personal benefit pension funds both directly from one of the plans and indirectly from an investment account that had been set up using money from the other plan. The total amount of pension funds that he stole was $502,977.69.

During that period, in January of 2008, Florida's Second District Court of Appeal affirmed the orders distributing $452,242 of Massam's pension assets to his ex-wife. See Massam v. Massam, 993 So. 2d 1022 (Fla. 2d DCA 2008). His obligation to her under those orders was satisfied from the supersedeas bond.

All of that happened before the investigation began into Massam's theft from the pension plans. The investigation started after some participants in the plans had trouble getting their distributions, and one of them reported the problem to the United States Department of Labor. It led to Massam being indicted on fourteen counts, all of which concerned his theft of the pension funds.[2] He entered into an agreement under which he pleaded guilty to Count I of the indictment, which charged theft and embezzlement of employee benefit funds in violation of 18 U.S.C. § 664, in exchange for the dismissal of the other thirteen counts. To provide a factual basis for his guilty plea, Massam stipulated that he unlawfully

---

[2] He was indicted on six counts of theft and embezzlement of employee benefit funds in violation of 18 U.S.C. § 644, seven counts of money laundering in violation of 18 U.S.C. § 1957, and one count of making materially false statements and representations in violation of 18 U.S.C. § 1001.

transferred $275,000 from one of the pension accounts to his personal account for his own use on September 22, 2006.

II.

The presentence investigation report (PSR) set Massam's base offense level at 6. See United States Sentencing Guidelines § 2B1.1(a)(2) (Nov. 2012). It calculated the loss amount for the offense to be $772,768.12. Of course, the loss calculation for guidelines purposes often is not the same as the actual loss suffered by victims of the crime because the commentary to U.S.S.G. § 2B1.1 provides that "loss is the greater of actual loss or intended loss." Id. § 2B1.1 cmt. n.3(A). In this case, the PSR arrived at a loss amount of $772,768.12 by the following calculation:

| Intended loss: | $1,185,863.32 | (The amount Massam attempted to transfer to the Anglo Irish Bank) |
| --- | --- | --- |
| Credit: | −$413,095.20 | (The funds left in the pension accounts) |
| Total Loss Amount: | $772,768.12 | |

The PSR looked to Massam's failed attempt to transfer all of the plans' funds to the Anglo Irish Bank for its baseline "intended loss" of $1,185,863.62. It then allowed a credit against loss for the funds still available in the pension accounts,

arriving at its final loss amount of $772,768.12.  Because the resulting loss amount was over $400,000 but under $1,000,000, Massam's offense level was enhanced by 14 under U.S.S.G. § 2B1.1(b)(1)(H).

The PSR also applied a 2-level enhancement due to Massam's abuse of a position of trust.  See id. § 3B1.3.  It subtracted 3 levels because he had accepted responsibility for the offense and timely notified the authorities of his intention to plead guilty.  Id. § 3E1.1(a)–(b).  All of this resulted in an adjusted offense level of 19.  Combining that with his criminal history category of I yielded an advisory guidelines range of 30 to 37 months of imprisonment.

Massam filed several objections to the PSR, only two of which relate to the loss calculation issues that he has raised in this appeal.  Both objections asserted that he should receive credit for events that occurred after he tried and failed to illegally transfer the $1,185,863.32 to the Anglo Irish Bank in August 2005.  First, he argued that the loss amount should be offset by the $350,000 he invested in what turned out to be a Ponzi scheme (at the Hanover Corporation) because that was, or at least was intended to be, a legitimate investment made on behalf of the pension plans.  Second, he argued that the PSR should have credited against the loss amount the $452,242 that was paid out of the supersedeas bond to satisfy his pension-related obligations to his ex-wife under the asset allocation orders.  The government opposed both of those credits, but the district court was partially

6

receptive to Massam's arguments. It allowed him an additional credit against loss for the $350,000 investment of pension funds that was lost in the Hanover investment, but it refused to credit him for the supersedeas bond payment to his ex-wife. The court's final calculation of the loss amount was as follows:

| | | |
|---|---|---|
| **Intended loss:** | $1,185,863.32 | (The amount Massam attempted to transfer to the Anglo Irish Bank) |
| **Credit:** | –$413,095.20 | (The funds left in the pension accounts) |
| **Credit:** | –$350,000 | (The investment in Hanover corporation) |
| **Total Loss Amount:** | $422,768.12 | |

Because the additional credit for the Hanover investment did not reduce the loss amount below $400,000, Massam still received a 14-level loss enhancement. See id. § 2B1.1(b)(1)(H). The district court, however, varied downward from the 30 to 37 month guidelines range, sentencing Massam to 24 months imprisonment, a fine of $50,000, restitution of $147,478.36, and two years of probation.

### III.

Massam appeals his sentence on one ground. He argues that the district court should have allowed a credit against loss for satisfaction from the supersedeas bond of the amount he owed his ex-wife under the asset allocation orders issued during their divorce. If the district court had given him that $452,242 credit, no enhancement for the amount of loss would have applied, his adjusted

7

offense level would have been dropped from 19 to 5, and his guidelines range would have been 0 to 6 months imprisonment with a maximum fine of $5,000. See U.S.S.G. ch. 5, pt. A; id. § 5E1.2(c)(3). If the district court was wrong not to credit Massam for the divorce decree payment, we would vacate his sentence. See United States v. Barner, 572 F.3d 1239, 1247 (11th Cir. 2009) ("[E]rror in the district court's calculation of the Sentencing Guidelines range warrants vacating the sentence, unless the error is harmless."). But for reasons we will explain, the district court was not wrong.

A.

As we have mentioned, the guidelines commentary provides that when calculating loss, "the greater of actual loss or intended loss" is to be used. U.S.S.G. § 2B1.1 cmt. n.3(A); see United States v. Patterson, 595 F.3d 1324, 1327 (11th Cir. 2010) (noting that where intended loss is greater "[a] criminal pays the price for the ambition of his acts, not their thoroughness"). In this case the intended loss was greater, and that is the amount the district court used. It correctly determined that the intended loss was $1,185,863.32, the total amount of pension funds at the time Massam attempted to transfer all of them to the Anglo Irish Bank, and neither party argues in this Court that the district court erred in finding, before any credits, an intended loss of that amount. We take it as a given.

8

The guidelines commentary provides that "[l]oss shall be reduced by . . .

[t]he money returned . . . by the defendant or other persons acting jointly with the

defendant to the victim before the offense was detected."  U.S.S.G. § 2B1.1 cmt.

n.3(E)(i).  On the basis of that provision, Massam contends that he is entitled to a

credit against loss in the amount that was paid from the supersedeas bond to satisfy

the distribution orders entered in his divorce case after his appeal from those orders

failed.   He argues that those distribution orders made his ex-wife a statutory

beneficiary under the pension plans; [3] that she is just as much a "victim" of his

embezzlement from the plans as their other beneficiaries; and because her interest

in the plans was ultimately paid to her from the bond that Massam had posted, he

should be credited in that amount for "returning" the money to her.

Massam's argument is defeated at the start by the fact that the loss was

calculated based solely on intended loss.  A credit against loss based on money

returned is not available for intended loss alone.  It is not available because the

guidelines commentary concerning the credit requires that the money be returned

---

[3] Although benefits under ERISA plans generally cannot be assigned or alienated, see 29 U.S.C. § 1056(d)(1), there is a specific exception to this rule for "qualified domestic relations orders," which is what the distribution orders in this case were, id. § 1056(d)(3)(A).  The law recognizes that a qualified domestic relations order creates "an alternate payee's right to . . . receive all or a portion of the benefits payable with respect to a participant under the plan," id. § 1056(d)(3)(B)(i), and explicitly provides that a person designated as an "alternate payee under [such an order] shall be considered . . . a beneficiary under the plan," id. § 1056(d)(3)(J).  For purposes of our discussion of Massam's argument, we will accept its premise that the two asset distribution orders in this case were qualified domestic relations orders, which made Massam's ex-wife a beneficiary of the pension plans.

"to the victim." Id. § 2B1.1 cmt. n.3(E)(i).  "Victim" is defined as "any person who sustained any part of the <u>actual loss</u> determined under subsection (b)(1)."  Id. § 2B1.1 cmt. n.1 (emphasis added).  And "actual loss" is defined as "the reasonably foreseeable pecuniary <u>harm that resulted from the offense</u>." Id. § 2B1.1 cmt. n.3(A)(i) (emphasis added).  Putting those points together, a credit against loss requires a "victim," which requires an actual loss, which does not exist when there is only intended loss.  <u>See</u> <u>United States v. Kennedy</u>, 554 F.3d 415, 419 (3d Cir. 2009) (holding that sustaining actual pecuniary harm "is a prerequisite for being deemed a 'victim'" under § 2B1.1); <u>see also</u> <u>United States v. Conner</u>, 537 F.3d 480, 489 (5th Cir. 2008) (concluding that account holders who temporarily lost funds but were then fully reimbursed were not victims because they "did not suffer any 'actual loss'"); <u>United States v. Icaza</u>, 492 F.3d 967, 969–70 (8th Cir. 2007) (reversing the district court's finding that each Walgreen's store that was robbed by the defendants was a separate victim because "only the Walgreens corporation sustained an actual loss" and no individual store "ultimately bore the pecuniary harm"); <u>United States v. Yagar</u>, 404 F.3d 967, 971 (6th Cir. 2005) (account holders who lost funds but were reimbursed were not victims because they suffered no "'actual loss'" or "'pecuniary harm'").  That is what the guidelines and their commentary mean, and a different rule would make no sense.

10

A thief cannot return money that he never succeeded in stealing.[4]  So the credit against loss contention that Massam pursued in the district court loses because of the annoying inconvenience of contrary law, which is contained in the commentary to the guideline that governs the credit.

B.

Massam appears, however, to have shifted his argument from the one he made in the district court, or at least added a layer to it.  He now contends that his ex-wife became an actual loss victim, not just an intended one, when he transferred or attempted to transfer the entire balance in both pension plans to the Austrian bank in August of 2005.  Appellant's Br. at 16.  Massam insists that she became an actual victim once he did that because "her property interest was imperiled by the overseas transfer," id., and he ought to be credited because her interest in the pension plans was thereafter paid out of the bonds he had to post before he could file an appeal in the divorce case.

Even assuming this contention is properly preserved and before us, it is flawed by the disconnect between the loss Massam claims to have inflicted on his ex-wife and the payment she received that he wants credit for.  If she suffered an actual loss, it occurred when Massam transferred, or attempted to transfer, the

---

[4] Beginning in July 2006, Massam did succeed in stealing from the pension plans, but by then his ex-wife's entire interest in them had been superseded by the supersedeas bond, which he posted as a condition of his appeal in November 2005.  When his successful stealing started, his ex-wife's interest was no longer, to use his term, "imperiled," but instead was safe and secure, fully protected by the bond.

11

entire balance of both pension plans to Austria (an event she apparently was unaware of). Any loss that event conceivably caused her was undone when the Austrian bank, against Massam's wishes, either rejected the transfer attempt or transferred the money back. That happened in October of 2005, so it was then, not when his ex-wife collected on the supersedeas bond twenty-seven months later in January 2008, that any actual loss she had suffered was undone. (Massam had to post the bond in order to appeal — part of an effort by him to avoid paying his ex-wife anything — which makes his claim for credit ring hollow.)

The payment out of the bond of his ex-wife's interest in the pension funds logically could not have undone any loss she had suffered from the Austrian bank caper. It could not have, because that loss had already been undone when the transfer or attempted transfer was foiled more than two years before she received anything from the bond proceeds. It follows that Massam is not entitled to any credit against loss on the ground that his ex-wife was able to collect her interest in the pension funds from the supersedeas bond in January 2008.[5]

---

[5] Massam's bond proceeds argument faces another obstacle. The commentary to the guidelines provides that a credit against loss is available only where money is returned to the victim "by the defendant or other persons acting jointly with the defendant." U.S.S.G. § 2B1.1 cmt. n.3(E)(i) (emphasis added). It is not clear that payment from a bond is the return of money "by the defendant" or by one "acting jointly with the defendant." We note the issue but have no occasion to decide it.

C.

For these reasons, the district court did not err in refusing to give Massam a credit against the intended loss amount, and it correctly calculated his adjusted offense level and sentencing guidelines range.

**AFFIRMED**.