**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 23-4318**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

SAMPSON PEARSON,

Defendant – Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Max O. Cogburn, Jr., District Judge.  (3:19-cr-00169-MOC-DCK-1)

Submitted:  October 7, 2025                     Decided:  December 30, 2025

Before WYNN, THACKER, and HARRIS, Circuit Judges.

Affirmed by unpublished opinion.  Judge Harris wrote the opinion, in which Judge Wynn and Judge Thacker joined.

**ON BRIEF:**  D. Baker McIntyre, III, Charlotte, North Carolina, for Appellant.  Russ Ferguson, United States Attorney, Dena J. King, United States Attorney, Anthony J. Enright, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PAMELA HARRIS, Circuit Judge:

Sampson Pearson was convicted of nine counts of wire fraud, aggravated identity theft, and filing false tax returns.  The district court sentenced Pearson to a total of 84 months in prison on these convictions.  On appeal, Pearson challenges only his sentence, contesting the district court's application of two Sentencing Guidelines enhancements: one for an offense involving ten or more victims, pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), and one for willfully obstructing the administration of justice, pursuant to U.S.S.G. § 3C1.1.  Finding no error, we affirm.

## I.

### A.

Between 2001 and 2017, Sampson Pearson worked as a financial advisor with Northwestern Mutual, selling annuities and life insurance products.  Over the course of several years, Pearson used his position to fraudulently obtain hundreds of thousands of dollars in loan and annuity proceeds.  First, Pearson would submit to Northwestern Mutual false loan applications and disbursement requests against client insurance policies and annuities; although the applications appeared to come from the clients, they in fact came from Pearson, without client authorization or knowledge.  Then Pearson would adjust the relevant paperwork, changing the client addresses on file to his own and submitting altered documents purporting to show that his personal bank account was actually a client bank account.  As a result, correspondence from Northwestern Mutual about the loans and

2

disbursements was sent to Pearson, and the requested funds were deposited into Pearson's personal bank account.

To hide his scheme, Pearson told clients he was investing their money in Northwestern Mutual investment products and sometimes provided fraudulent documentation of these purported investments. He made "lulling" payments to some clients using funds fraudulently obtained from others. And when clients raised questions about their policies and annuities, Pearson provided them with false information, including telling some that tax documents they received for the loans and disbursements had been sent by mistake and could be discarded.

In total, Pearson obtained more than $570,000 in deposits to his personal bank account. None of his ill-gotten gains were reported on his tax returns; instead, he knowingly misrepresented his total income for several years in a row.

**B.**

After this scheme was discovered, a federal grand jury in the Western District of North Carolina indicted Pearson on nine counts, including one count of wire fraud, 18 U.S.C. § 1343; four counts of aggravated identity theft, *id.* § 1028A(a)(1); and four counts of filing false tax returns, 26 U.S.C. § 7206(1). Pearson was released on bond after acknowledging he was obligated to appear in court as required.

The case proceeded to a jury trial. On the morning jury selection was scheduled to begin, Pearson failed to appear in court. The district court revoked Pearson's bond, issued a bench warrant, and rescheduled jury selection for a later date. The jury was successfully

3

seated on the second attempt, and at the conclusion of the trial Pearson was convicted on all nine counts.

In preparation for sentencing, the probation office's Presentence Investigation Report ("PSR") calculated Pearson's Sentencing Guidelines advisory range as 94 to 111 months' imprisonment. Part of that total – not at issue on appeal – was attributable to a 24-month mandatory consecutive sentence for Pearson's aggravated identity theft convictions. *See* 18 U.S.C. § 1028A(a)(1), (b)(2), (b)(4); U.S.S.G. § 2B1.6 (2021).[1] But to that, the PSR added a range of 70 to 87 months for Pearson's wire fraud and false tax return convictions, based on a criminal history score of I and a total offense level of 27. And to arrive at that offense level, the PSR applied a number of enhancements, including the two at issue on appeal: one for a crime involving ten or more victims, pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), and another for willful obstruction of justice, pursuant to U.S.S.G. § 3C1.1.

Pearson objected to the application of these two enhancements. At sentencing, the district court overruled both objections and adopted the PSR's Guidelines calculation. When imposing sentence, however, the district court varied downward two levels to negate the impact of the obstruction of justice enhancement. With this variance, Pearson's new

---

[1] We apply the 2021 version of the Guidelines, which was in effect at the time of Pearson's sentencing. *See United States v. Lewis*, 606 F.3d 193, 198–99 (4th Cir. 2010); *United States v. Foreman*, 560 F. App'x 219, 220 n.1 (4th Cir. 2014). Unless otherwise noted, all citations to the Guidelines refer to this version.

Guidelines range was 81 to 95 months. The district court sentenced him to a total of 84 months in prison.

Pearson timely appealed. Because the parties' arguments rely in part on Sentencing Guidelines commentary, we requested supplemental briefing on the applicability of the commentary in light of *Kisor v. Wilkie*, 588 U.S. 558 (2019), and our subsequent precedent, which makes clear that we defer to Guidelines commentary only when the text of the relevant Guideline is ambiguous, the commentary's definition falls within the zone of ambiguity, and the commentary's character and context entitles it to deference. *See United States v. Mitchell*, 120 F.4th 1233, 1240 (4th Cir. 2024).

## II.

On appeal, Pearson challenges only the district court's application of the Sentencing Guidelines enhancements for ten or more victims, *see* U.S.S.G. § 2B1.1(b)(2)(A)(i), and willful obstruction of justice, *see* U.S.S.G. § 3C1.1. In assessing the application of a Guidelines enhancement, we review the district court's findings of fact for clear error and its interpretations of the Guidelines de novo. *United States v. Chandia*, 675 F.3d 329, 337 (4th Cir. 2012).

## A.

We consider first the two-level enhancement for willfully obstructing the administration of justice, *see* U.S.S.G. § 3C1.1, which the district court applied based on Pearson's failure to appear in court on the day jury selection was originally scheduled to begin. The scope of this enhancement is not on appeal, because Pearson concedes that the

5

enhancement may appropriately be applied when a defendant willfully fails to appear as ordered for a judicial proceeding.  Instead, Pearson argues the facts, contending that his failure to appear for jury selection was due to a lack of transportation and thus was not willful.

We disagree.  Although Pearson told his attorney that he could not appear for jury selection because he did not have transportation, he later told the district court that he "didn't come to court the first time" because he "didn't . . . want to participate in the trial at all."  J.A. 789.  Moreover, he successfully appeared at every other court hearing in the lead-up to his trial and had more than a month of advance notice of the original jury selection date.  On this record, the district court did not clearly err in finding that Pearson's failure to appear for jury selection was willful, and we therefore affirm the district court's application of the willful obstruction of justice enhancement.[2]

**B.**

Pearson next challenges the district court's application of the two-level enhancement at U.S.S.G. § 2B1.1(b)(2)(A)(i), which applies when an offense "involved 10 or more victims."  Pearson does not dispute that his criminal conduct involved at least ten

---

[2] Even if the district court had erred in applying the enhancement, this would be a textbook case of harmless error.  We need not remand for resentencing when a misapplication of the Guidelines "did not affect the district court's selection of the sentence imposed." *Williams v. United States*, 503 U.S. 193, 203 (1992); *see also* Fed. R. Cr. P. 52(a).  That is the case here.  Finding that Pearson's obstruction was "technical[]" in nature, J.A. 1008, the district court varied downward two levels to negate the effect of the obstruction enhancement, and then sentenced Pearson based on that lower, post-variance Guidelines range.  Application of the enhancement thus had no impact on Pearson's sentence.

of his clients.  Instead, he argues that his clients were not "victims" of his fraud.  That argument relies entirely on the Guidelines commentary to § 2B1.1, which defines a "victim" as someone who suffered a reasonably foreseeable "pecuniary loss."  *See* U.S.S.G. § 2B1.1 cmt. nn.1, 3(A)(i).[3]  Here, Pearson reasons, none of his clients suffered pecuniary harm because each was reimbursed in full by Northwestern Mutual.  And Pearson points for support to cases from some of our sister circuits, adopting his position in construing the commentary to § 2B1.1.  *See United States v. Kennedy*, 554 F.3d 415, 419 (3d Cir. 2009); *United States v. Conner*, 537 F.3d 480, 488–92 (5th Cir. 2008); *United States v. Yagar*, 404 F.3d 967, 971 (6th Cir. 2005).

But those cases cannot carry the day for Pearson, because they were decided before *Kisor* clarified that we defer to Guidelines commentary only when the text of the relevant Guideline is "genuinely ambiguous."  *Mitchell*, 120 F.4th at 1240; *cf. Kennedy*, 554 F.3d at 419 (explaining obligation to follow commentary definition "even if it varies from [a] term's ordinary meaning" (internal quotation marks omitted)).  The first question now, in other words, is not how best to interpret the definition of "victim" in § 2B1.1's commentary, but whether § 2B1.1 itself has a "plain and unambiguous meaning," applied

---

[3] More specifically, the commentary to § 2B1.1 defines a "victim" as a "person who sustained any part of the actual loss" as determined under that Guideline.  U.S.S.G. § 2B1.1 cmt. n.1.  At the time of Pearson's sentencing, the commentary went on to define "actual loss" as the "reasonably foreseeable pecuniary harm that resulted from the offense."  U.S.S.G. § 2B1.1 cmt. n.3(A)(i) (2021).  That definition of actual loss has since been incorporated into the text of § 2B1.1.  *See* U.S.S.G. § 2B1.1(b)(1)(C)(i) (2025).  The definition of "victim," however, continues to appear only in the commentary.  *See* U.S.S.G. § 2B1.1 cmt. n.1 (2025).

7

to the "particular dispute in [this] case," *Mitchell*, 120 F.4th at 1241 (citation and quotation marks omitted), when it calls for a two-level enhancement for an offense "involv[ing] 10 or more victims," U.S.S.G. § 2B1.1(b)(2)(A)(i).  We are inclined to think that it does, and that the word "victim" unambiguously covers those of Pearson's clients – concededly ten or more – who were targeted by Pearson as part of his fraud.  *See United States v. Terry*, 142 F.3d 702, 710 (4th Cir. 1998) (identifying one "ordinary or natural meaning" of "victim" as a "person who is the object of a crime or tort" (quoting *Victim*, Black's Law Dictionary (6th ed. 1990))).  Nothing about the use of "victims" in § 2B1.1(b)(2)(A)(i) suggests that the word somehow *excludes* those who suffer financial harms that are temporary rather than permanent.  Indeed, one of the very cases relied upon by Pearson recognizes as much, explaining that clients defrauded but then reimbursed "would satisfy a commonsense or dictionary definition" of "victim."  *Kennedy*, 554 F.3d at 419.

Ultimately, however, we need not resolve that question here, because even if we thought § 2B1.1(b)(2)(A)(i) was ambiguous and turned to its commentary for clarification, we would reach the same result.  Pearson, as noted above, relies on one definition in § 2B1.1's commentary, under which a "victim" is a person who has sustained a "pecuniary loss," and argues that his clients do not qualify because their losses were reimbursed.  But the commentary also provides a second definition that applies to the enhancement at issue, under which a "victim" is "any individual whose means of identification was used unlawfully or without authority."  *See* U.S.S.G. § 2B1.1 cmt. n.4(E).  And that definition alone "indisputably warrants the application of the number-of-victims enhancement."  *See United States v. Otuya*, 720 F.3d 183, 192 (4th Cir. 2013) (affirming application of § 2B1.1

8

enhancement under an alternative definition of "victim" without resolving whether "pecuniary harm" definition would apply).

For purposes of this definition of "victim," a "means of identification" is "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual."  18 U.S.C. § 1028(d)(7) (incorporated by U.S.S.G. § 2B1.1 cmt. n.1).  The evidence introduced at trial established that Pearson used the names, policy or contract numbers, social security numbers, and other means of identification of at least ten clients to submit his fraudulent loan applications and disbursement requests.  None of this use was authorized; all of it was unlawful.  Pearson does not dispute any of this evidence, and he does not meaningfully contest application of this alternative definition.  So on this ground alone, we may affirm the district court's application of § 2B1.1(b)(2)(A)(i)'s two-level enhancement for offenses involving ten or more victims.

## III.

For the foregoing reasons, the judgment of the district court is affirmed.

*AFFIRMED*

9